# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 10, 2005          Decided May 24, 2005

No. 04-5240

LUCK'S MUSIC LIBRARY, INC. AND
MOVIECRAFT, INC.,
APPELLANTS

v.

ALBERTO R. GONZALES,
ATTORNEY GENERAL OF THE UNITED STATES AND
MARYBETH PETERS, REGISTER OF COPYRIGHTS, COPYRIGHT
OFFICE OF THE UNITED STATES,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cv02220)

———

*Daniel H. Bromberg* argued the cause for appellants. With him on the briefs were *Geoffrey S. Stewart*, *Carmen M. Guerricagoitia*, and *Jonathan L. Zittrain*.

*John S. Koppel*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were

*Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, and *William G. Kanter*, Deputy Director.

Before: RANDOLPH and ROBERTS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Plaintiffs challenge the constitutionality of § 514 of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809, 4976 (1994), codified at 17 U.S.C. §§ 104A, 109, which implements Article 18 of the Berne Convention for the Protection of Literary and Artistic Works. The section establishes copyright in various kinds of works that had previously entered the public domain, and plaintiffs argue that any such provision violates the Copyright and Patent Clause of the U.S. Constitution. U.S. Const. art. I, § 8, cl. 8. Finding no such bar in the Constitution, the district court dismissed plaintiffs' claims. (A district court in Colorado has recently agreed. *Golan v. Gonzales*, No. 01-B-1854, 2005 WL 914754 (D. Colo. Apr. 20, 2005).) We review the district court's order de novo, *Barr v. Clinton*, 370 F.3d 1196, 1201 (D.C. Cir. 2004), and affirm.

\* \* \*

Section 514 of the URAA establishes copyrights of foreign holders whose works, though protected under the law where initially published, fell into the public domain in the United States for a variety of reasons—the U.S. failed to recognize copyrights of a particular nation, the copyright owner failed to comply with formalities of U.S. copyright law,

or, in the case of sound recordings "fixed" before February 15, 1972, federal copyright protection had been unavailable. See 17 U.S.C. § 104A(h)(6). Plaintiff Luck's Music Library is a corporation that rents and sells classical orchestral sheet music. Moviecraft is a commercial film archive that preserves, restores, and sells old footage and films. Both plaintiffs allege that because of the URAA they may no longer freely distribute certain works in their portfolios.

The Copyright and Patent Clause provides that Congress shall have the power "to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., art. I, § 8, cl. 8. The Clause authorizes the granting of a temporary monopoly over created works, in order to motivate authors and inventors while assuring the public free access at the end of the monopoly. See *Sony Corp. of America v. Universal City Studios*, 464 U.S. 417, 429 (1984). Plaintiffs are correct that the Clause "contains both a grant of power and certain limitations upon the exercise of that power." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146 (1989). But they are wrong that the Clause creates any categorical ban on Congress's removing works from the public domain.

Plaintiffs first suggest that to pass muster under the Clause a statute must create an incentive for authors to create new works: legislation must "promote the progress of science." In their view, copyright laws that remove works from the public domain "do not provide significant incentives for new creations" because "rewarding prior works will not provide any significant incentive to create new works because it will not change the costs and benefits of doing so." Plaintiffs' Br. at 17. This of course was the core argument advanced against the Copyright Term Extension Act in *Eldred*

*v. Ashcroft*, 537 U.S. 186 (2003). There it was argued that extensions for works already in existence could not possibly affect authors' incentives to create those works. As a result, the *Eldred* plaintiffs urged, Congress utterly lacked the power to grant such extensions, *id*. at 199-204, the extension was an irrational exercise of the power, *id*. at 204-08, it failed to promote the progress of science, *id*. at 211-14, and it failed to comply with a quid pro quo requirement embedded in the Clause, *id*. at 214-17. In all of these variations the argument lost.

It is true, of course, that changes in the law of copyright cannot affect the structure of incentives for works already created. But the knowledge that Congress may pass laws like the URAA in the future does affect the returns from investing time and effort in producing works. All else equal, the expected benefits of creating new works are greater if Congress can remedy the loss of copyright protection for works that have fallen accidentally into the public domain. The *Eldred* Court made a parallel point in rejecting plaintiffs' quid pro quo theory, noting that any author of a work "in the last 170 years would reasonably comprehend, as the 'this' [i.e., quid] offered her, a copyright not only for the time in place when protection is gained, but also for any renewal or extension legislated during that time." *Id*. at 214-15.

To be sure, the extra incentive afforded by § 514 is meager. But to the extent that *Eldred* requires *any* direct incentive, it plainly need not be great. Justice Breyer argued in dissent that the extension upheld there would, assuming a 1% chance that a work would yield $100 a year in years 55-75 of the work's life, have a total present value of seven cents. *Eldred*, 537 U.S. at 254-55 (Breyer, J., dissenting). The majority did not contest his figures, compare *id*. at 209-10 n.16 (doubting whether the founders, in limiting copyright to

"limited times," "thought in terms of the calculator rather than the calendar"), so we may assume it regarded such a low value as direct incentive enough.

Perhaps more than enough. It is by no means clear that *Eldred* requires a direct incentive at all. The majority expressly relied on its understanding that adoption of the 20-year term extension enhanced the United States's position in negotiating with European Union countries for benefits for American authors. *Id*. at 205-06. Here, similarly, the Senate argued in support of § 514 that its adoption helped secure better foreign protection for US intellectual property and was "a significant opportunity to reduce the impact of copyright piracy on our world trade position." S. Rep. No. 100-352, at 2 (1988). Plaintiffs do not gainsay the value of the rule in § 514 as a bargaining chip.

On a pragmatic plane, plaintiffs argue that a bright line rule against laws that remove works from the public domain would assure a sound balance between the founders' desire to allow proper incentives for creative effort and their anxiety about political establishment of unjustifiable monopolies. Here they make a public choice argument:

> Just as the English Crown could not be trusted to grant socially beneficial monopolies over existing goods and industries, Congress cannot be trusted to issue patents and copyrights over existing goods and services because there is a "persistent asymmetry" in the legislative process. [William M.] Landes & [Richard A.] Posner, *The Economic Structure of Intellectual Property Law* 408 [(2003)].

Plaintiffs' Br. at 21. They go on to argue that "authors and large entertainment companies" have a clear and focused

interest in obtaining exclusive rights of works in the public domain, whereas those likely to be adversely affected are a diffuse group who at the time of legislation will lack an adequate interest to justify any lobbying effort (or, plaintiffs might add, even much effort at becoming informed on the matter). *Id.*

The picture is a bit overdrawn; authors and the large entertainment companies are themselves users of copyrightable works, as literature is itself a source of literature (think of Shakespeare and Holinshed). Further, the principled and rigorous application of plaintiffs' public choice analysis would radically tilt the relations among the three branches of government. But the key flaw in the argument is that the *Eldred* plaintiffs were similarly arguing for a bright line rule (no extension of copyright terms for already completed works), in a context with a closely parallel lobbying imbalance, and *Eldred* rejected their claims.

Plaintiffs completely fail to adduce any substantive distinction between the imbalance (if it be that) in tacking 20 years onto a copyright term about to expire in (say) a year, and extending protection to material that has fallen into the public domain. One can imagine that creation of copyright ex nihilo would entail special practical difficulties for parties that have relied on the apparent availability of works in the public domain only to find free access snatched away, but § 514 protects those who have relied without notice, see § 514(d)(2), 17 U.S.C. § 104A(d)(2), and plaintiffs don't challenge these provisions' adequacy.

Unable to offer a material distinction between this case and *Eldred* in terms of the language of the Copyright and Patent Clause or the proper roles of Congress and the judiciary, plaintiffs turn to a historical distinction. They say

that taking works out of the public domain is without precedent, in contrast with the congressional pattern of extensions of copyright for completed works on which the Court relied in *Eldred*. Especially lacking, they say, is a practice of the First Congress, whose action bears the imprimatur of the founders themselves. See *Eldred*, 537 U.S. at 213-14.

In fact, evidence from the First Congress points toward constitutionality. The Copyright Act of 1790 granted copyright protection to certain books already printed in the United States at the time of the statute's enactment. See 1 Stat. 124 (1790). If such works were unprotected by common law copyright, that statute would necessarily have granted protection to works previously unprotected—that is, works in the public domain. The historical evidence on this point is contested, but as early as 1834 the Supreme Court was of the view that the Act of 1790 created new copyright protection rather than simply recognizing existing protections, relying on the statutory language (the author "shall have the sole right," etc.) in reaching that conclusion. See *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 661 (1834) ("Congress, then, by this act, instead of sanctioning an existing right, as contended for, created it.").

Apart from the Act of 1790, plaintiffs insist that no federal statute has ever authorized removing work from the public domain. But the government and the district court point to other statutes that seemingly have done just that. The Act of Dec. 8, 1919, Pub. L. No. 66-102, 41 Stat. 368, gave the President authority to give authors publishing works abroad during World War I time to comply with procedural formalities in the United States after the war's end. Similarly, the Act of Sept. 25, 1941, Pub. L. No. 77-258, 55 Stat. 732, gave the President authority to make copyright protection

available to authors who might have been temporarily unable to comply with required formalities because of disruption or suspension of needed facilities. Plaintiffs urge that these acts simply extended the time limits for filing and that they do not purport to modify the prohibition on removing works from the public domain. But to the extent that potential copyright holders failed to satisfy procedural requirements, such works would necessarily have already entered the public domain at the time the statutes were passed.

Plaintiffs also invoke a dictum in *Graham v. John Deere Co.*, 383 U.S. 1 (1966): "Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available." *Id*. at 6. Several factors weaken the dictum's force. First, the case dealt with patents rather than copyright, and ideas applicable to one don't automatically apply to the other. For example, the *Eldred* Court saw the "quid pro quo" idea as having a special force in patent law, where the patentee, in exchange for exclusive rights, must disclose his "discoveries" against his presumed will. 537 U.S. at 216-17. In contrast, the author is eager to disclose her work. *Id*.

Second, the *Eldred* Court itself weakened any inference that might be drawn from the *Graham* dictum, using patent cases as a basis for upholding the extension of existing copyrights. Discussing *McClurg v. Kingsland*, 42 U.S. 202 (1843), the Court said that the

> patentee in that case was unprotected under the law in force when the patent issued because he had allowed his employer briefly to practice the invention before he obtained the patent. Only upon enactment, two years

> later, of an exemption for such allowances did the patent become valid, retroactive to the time it issued.

*Eldred*, 537 U.S. at 203. On this view, *McClurg* upheld the creation of patent protection for an invention that had lapsed into the public domain at least two years earlier. Plaintiffs insist that the *Eldred* Court misread *McClurg*, and that its characterization was mere dictum anyway. See Plaintiffs' Reply Br. at 14. While *McClurg* strikes us as one of the most opaque decisions ever crafted, so that we can hardly rule out the possibility of a Supreme Court misreading, we do not see the sort of smoking gun that might embolden us, as an "inferior" federal court (U.S. Const., art. III, § 1), to substitute our judgment for the Court's discussion, now but two years old. Certainly we are not persuaded that *McClurg* "implicitly" agrees with plaintiffs "that Congress may not grant patents over matters in the public domain." See Plaintiffs' Reply Br. at 13.

* * *

The decision of the district court is

*Affirmed.*