**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 4, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LAWRENCE GOLAN; ESTATE OF
RICHARD KAPP; S.A. PUBLISHING
CO, INC., d/b/a ESS.A.Y.
RECORDINGS; SYMPHONY OF THE
CANYONS; RON HALL d/b/a
FESTIVAL FILMS; and JOHN
McDONOUGH, d/b/a TIMELESS
VIDEO ALTERNATIVES
INTERNATIONAL,

        Plaintiffs-Appellants,

v.

ALBERTO R. GONZALES, in his
official capacity as Attorney General of
the United States; and MARYBETH
PETERS, Register of Copyrights,
Copyright Office of the
United States,

        Defendants-Appellees,

INTERNATIONAL COALITION FOR
COPYRIGHT PROTECTION,

        Amicus Curiae.

No. 05-1259

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:01-cv-01854 LTB-BNB)**

Lawrence Lessig, Center for Internet and Society, Stanford Law School, Stanford, California (Hugh Q. Gottschalk and Carolyn J. Fairless, Wheeler Trigg Kennedy LLP, Denver, Colorado, with him on the briefs), for Plaintiffs-Appellants.

John S. Koppel, Appellate Staff Civil Division (Peter D. Keisler, Assistant Attorney General, William J. Leone, United States Attorney, and William Kanter, Appellate Staff Civil Division, Washington, D.C., with him on the brief), for Defendants-Appellees.

Eric M. Lieberman and David B. Goldstein, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York, New York, filed an Amicus Curiae brief in support of Defendants-Appellees.

Before **HENRY**, **BRISCOE**, and **LUCERO**, Circuit Judges.

**HENRY**, Circuit Judge.

Plaintiffs in this case range from orchestra conductors, educators, performers, and publishers to film archivists and motion picture distributors. They challenge two acts of Congress, the Copyright Term Extension Act ("CTEA"), Pub. L. No. 105-298, §§ 102(b) and (d), 112 Stat. 2827-28 (1998) (amending 17 U.S.C. §§ 302, 304), and § 514 of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809, 4976-80 (1994), codified at 17 U.S.C. §§ 104A,[1] 109.

---

[1] Section 104A provides in the pertinent part:

(a) Automatic protection and term.–

(continued...)

2

Also known as the Sonny Bono Copyright Term Extension Act, the CTEA

increased the duration of existing and future copyrights from life-plus-50-years to

life-plus-70-years.  Section 514 of the URAA implements Article 18 of the Berne

Convention for the Protection of Literary and Artistic works.  Ushered into being

in 1886 at the behest of *Association Littéraire et Artistique Internationale*, an

organization founded by Victor Hugo and dedicated to obtaining protection for

literary and artistic works, the Berne Convention requires member countries to

afford the same copyright protection to foreign authors as they provide their own

authors.  In this case, congressional compliance with the Berne Convention meant

---

[1](...continued)
(1) Term.
(A) Copyright subsists, in accordance with this section, in restored works, and vests automatically on the date of restoration.
.           .           .           .
(h) Definitions. For purposes of this section and section 109(a):
.           .           .           .
(6) The term "restored work" means an original work of authorship that–
(A) is protected under subsection (a);
(B) is not in the public domain in its source country through expiration of term of protection;
(C) is in the public domain in the United States due to–
      (I) noncompliance with formalities imposed at any time by United States copyright law, including failure of renewal, lack of proper notice, or failure to comply with any manufacturing requirements; (ii) lack of subject matter protection in the case of sound recordings fixed before February 15, 1972; or (iii) lack of national eligibility; and
(D) has at least one author or rightholder who was, at the time the work was created, a national or domiciliary of an eligible country, and if published was first published in an eligible country and not published in the United States during the 30-day period following publication in such eligible country.

copyrighting some foreign works in the public domain.[2]

Plaintiffs argue the CTEA extends existing copyrights in violation of the "limited Times" provision of the Constitution's Copyright Clause. With regard to the URAA, plaintiffs contend § 514 shrinks the public domain and thereby violates the limitations on congressional power inherent in the Copyright Clause. In addition, plaintiffs argue that § 514's removal of works from the public domain interferes with their First Amendment right to free expression.

The district court dismissed plaintiffs' CTEA claim and granted summary judgment for the government on plaintiffs' URAA challenges. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm the district court's dismissal of the CTEA claim as foreclosed by the Supreme Court's decision in *Eldred v. Ashcroft*, 537 U.S. 186 (2003). We also agree with the district court that § 514 of the URAA has not exceeded the limitations inherent in the Copyright Clause. Nevertheless, we hold that plaintiffs have shown sufficient free expression interests in works removed from the public domain to require First Amendment

---

[2] Article 18 of the Berne Convention provides in the pertinent part:

> (1) This Convention shall apply to all works which, at the moment of its coming into force, have not yet fallen into the public domain in the country of origin through the expiry of the term of protection.
> (2) If, however, through the expiry of the term of protection which was previously granted, a work has fallen into the public domain, of the country where the protection is claimed, that work shall not be protected anew[.]

4

scrutiny of § 514. On this limited basis, we remand for proceedings consistent with this opinion.

## I. BACKGROUND

Each plaintiff in this case relies on artistic works in the public domain for his or her livelihood. Lawrence Golan, for example, performs and teaches works by foreign composers including Dmitri Shostakovich and Igor Stravinsky. Before the CTEA, plaintiffs anticipated that certain works would soon outlive copyright protection and enter the public domain. The CTEA delayed this moment by 20 years. Prior to the URAA, each plaintiff utilized or performed works by foreign artists in the public domain, such as Sergei Prokofiev's renowned "Peter and the Wolf." Since the passage of the URAA, plaintiffs must pay higher performance fees and sheet music rentals as well as other royalties. In many cases, these costs are prohibitive.

Plaintiffs filed suit in the United States District Court for the District of Colorado arguing that both the CTEA and the URAA are unconstitutional. The court concluded the Supreme Court's decision in *Eldred* precluded plaintiffs' challenge to the CTEA and granted summary judgment to the government on plaintiffs' two URAA claims. *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1218 (D. Colo. 2004). Reasoning that "Congress has historically demonstrated little compunction about removing copyrightable materials from the public domain," the

5

district court ruled that Congress had the power to enact § 514 of the URAA under the Copyright Clause. *Golan v. Gonzales*, No. Civ. 01-B-1854(BNB), 2005 WL 914754, at *14 (D. Colo. Aug. 24, 2005). The court also granted summary judgment on plaintiffs' First Amendment claim, on the theory they had no protected interest in the now-copyrighted works. This appeal followed.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Steffy v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006). Summary judgment is appropriate only when "there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c). We also examine de novo the district court's conclusions regarding the Constitution. *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1223 (10th Cir. 2005). "[I]t is also appropriate to bear in mind . . . that in the enactment of a statute Congress is presumed to act with knowledge of controlling constitutional limitations or proscriptions and with an intent and purpose to avoid their contravention." *Wells, by Gillig, v. Att'y General of the United States*, 201 F.2d 556, 560 (10th Cir. 1953); *see also INS v. Chadha*, 462 U.S. 919, 944 (1983) ("We begin . . . with the presumption that the challenged statute is valid.").

## III. DISCUSSION

Plaintiffs claim that the CTEA's 20-year extension of existing copyrights violates the Copyright Clause's "limited Times" provision. In addition, they

contend that the URAA's removal of works from the public domain exceeds the authority granted to Congress under the Copyright Clause. Finally, plaintiffs maintain that § 514 of the URAA must be subject to First Amendment review because it has altered the traditional contours of copyright protection. Since familiarity with the foundations of copyright law is crucial to understanding the dispute, we begin with an outline of basic copyright principles.

Under the Copyright Clause, Congress may "promote the Progress of Science and useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their Writings." U.S. Const. art. I, § 8, cl. 8. The Supreme Court has explained that "[the Clause] is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). By encouraging creative expression through limited monopolies, the Copyright Clause "promot[es] broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). "[O]nce the . . . copyright monopoly has expired, the public may use the . . . work at will and without attribution." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33-34 (2003). These imaginative works inspire new creations, which in turn inspire others, hopefully, ad infinitum. This cycle is what

7

makes copyright "the engine of free expression." *Harper & Row Publishers Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

Congress's power to bestow copyrights is broad. *See Eldred*, 537 U.S. at 205 ("[I]t is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors . . . in order to give the public appropriate access to their work product.") (internal quotation marks omitted). But it is not boundless. The Copyright Clause itself limits Congress's power as to what kinds of works can be copyrighted and for how long. For instance, in order to be copyrightable, a work must be original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) ("The *sine qua non* of copyright is originality . . . . Originality is a constitutional requirement."). In addition, a copyright must be limited in duration. *Dastar*, 539 U.S. at 37 (noting that Congress cannot "create[] a species of perpetual . . . copyright"). The rationale underlying this limitation is that an infinite copyright would deprive the public of the benefit – the right to use and enjoy the expression – that it is supposed to receive in exchange for the grant of monopoly privileges to the author for a discrete period of time. *See id.* at 33-34 ("The rights of a . . . copyright holder are part of a carefully crafted bargain under which, once the . . . copyright monopoly has expired, the public may use the . . . work at will and without attribution.") (internal citation and quotation marks omitted).

8

The Supreme Court has recognized that the First Amendment can limit Congress's power under the Copyright Clause. *Eldred*, 537 U.S. at 219-21 (indicating that copyright acts are not "categorically immune from challenges under the First Amendment") (internal quotation marks omitted). The Court has emphasized, however, that "copyright's built-in First Amendment accommodations" – the idea/expression dichotomy and the fair use defense – generally protect the public's First Amendment interest in copyrighted works. *Id.* at 219-20.

The first of these "built-in safeguards," the idea/expression dichotomy, denies copyright protection "to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in [a copyrighted] work." 17 U.S.C. § 102(b). It reserves to authors, however, the right to exploit their "expression," *id.*, a term that refers to "the particular pattern of words, lines and colors, or musical notes" that comprise a work. ROBERT A. GORMAN, COPYRIGHT LAW 23 (2d ed. 2006).

The second safeguard, the fair use defense, allows the public to utilize a copyrighted work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107. The defense protects the public's First Amendment interest in an

9

author's original expression by "afford[ing] considerable latitude for scholarship and comment, and even for parody." *Eldred*, 537 U.S. at 220 (internal citations and quotation marks omitted).

Although these built-in free speech safeguards will ordinarily insulate legislation from First Amendment review, the *Eldred* Court indicated that such review is warranted when an act of Congress has "altered the traditional contours of copyright protection." *Id.* at 221. The Court did not define the "traditional contours of copyright protection." However, as we discuss in detail below, one of these traditional contours is the principle that once a work enters the public domain, no individual – not even the creator – may copyright it.

With these principles in mind, we turn to plaintiffs' challenges to the CTEA and URAA.

## A. THE CTEA

The Copyright Clause provides: "The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries[.]" U.S. Const., art. I, § 8, cl. 8. Plaintiffs contend the CTEA violates the "limited Times" prescription by increasing the term from life-plus-50-years to life-plus-70-years. More specifically, they argue that "the Framers would have considered the [life-plus-70] term to be so long as to be effectively

10

perpetual." Aplts' Br. at 55.

Analyzing the CTEA in light of the Clause's inherent limitations, the Supreme Court upheld the Act in *Eldred*. 537 U.S. at 194 ("[W]e reject petitioners' challenges to the CTEA. . . . Congress acted within its authority and did not transgress constitutional limitations."). Nevertheless, plaintiffs attempt to distinguish *Eldred*, invoking the Court's acknowledgment that "[p]etitioners [did] not challenge the 'life-plus-70-years' timespan itself." *Id.* at 193. Plaintiffs therefore contend that *Eldred* does not foreclose the argument that the CTEA's extension of all future copyrights to a life-plus-70-years timespan violates the Copyright Clause. Though plaintiffs may be correct that the *Eldred* Court did not technically address this term, the rationale underlying *Eldred* compels us to conclude that the CTEA-imposed timespan passes constitutional muster.

The Ninth Circuit recently upheld the dismissal of a nearly-identical CTEA challenge in *Kahle v. Gonzales*, 487 F.3d 697 (9th Cir. 2007). The plaintiffs in *Kahle*, like plaintiffs here, argued that the CTEA's life-plus-70-years copyright term violated the "limited Times" prescription because the Framers would have viewed it as "effectively perpetual." *Id.* at 699 (internal quotation marks omitted). As the Ninth Circuit observed, the *Eldred* Court "clearly grasped the role 'limited Times' play in the copyright scheme and the Framers' understanding of that phrase." *Id.* at 700. Indeed, the *Eldred* Court emphasized that our constitutional

11

scheme charges Congress, and not federal courts, with "the task of defining the scope of the limited monopoly that should be granted to authors." 537 U.S. at 205 (internal quotation marks omitted). As the *Kahle* court reasoned, "the outer boundary of 'limited Times' is determined by weighing the impetus provided to authors by longer terms against the benefit provided to the public by shorter terms. That weighing is left to Congress, subject to rationality review." *Kahle,* 487 F.3d at 701. This rationale is clearly consistent with *Eldred. See* 537 U.S. at 204 (reviewing the CTEA merely to determine "whether it is a rational exercise of the legislative authority conferred by the copyright clause").

We agree with the *Kahle* court's holding that *Eldred* precludes a challenge to the 20-year term extension. *See Eldred*, 537 U.S. at 208 ("We cannot conclude that the CTEA – which continues the unbroken congressional practice of treating future and existing copyrights in parity for term extension purposes – is an impermissible exercise of Congress' power under the Copyright Clause."). Plaintiffs here, like the plaintiffs in *Kahle*, "provide no compelling reason why we should depart from a recent Supreme Court decision." *Kahle*, 487 F.3d at 701.

B. The URAA

Plaintiffs present two arguments regarding the constitutionality of § 514 of the URAA. First, they claim that § 514 exceeds the authority granted to Congress in the Copyright Clause. Second, they maintain § 514 has disrupted the traditional

12

contours of copyright protection and thus demands First Amendment scrutiny. We begin with the contention that Congress has overstepped its Article I authority.

1.   **Section 514 does not violate the Copyright Clause**

Plaintiffs ground their argument that § 514 transgresses the bounds of Congress's Article I authority in the text of the Copyright Clause. They contend that § 514's extension of copyright protection to works in the public domain eviscerates any limitations imposed by the "limited Times" prescription and the Progress Clause. In essence, plaintiffs aver that unless we hold that the Progress Clause and the "limited Times" prescription prevent Congress from copyrighting works in the public domain, Congress could adopt a practice of copyrighting works as they fall into public domain. This would prevent the public from ever gaining unfettered access to the expressions.

We agree it would be troubling if Congress adopted a consistent practice of restoring works in the public domain in an effort to confer perpetual monopolies. But this argument is similar to one the *Eldred* plaintiffs raised, and, like the *Eldred* Court, we are mindful that "a regime of perpetual copyrights is clearly not the situation before us." *Eldred*, 537 U.S. at 209.

Plaintiffs cite *Graham v. John Deere Co.*, 383 U.S. 1 (1966), in support of their contentions. There, the Supreme Court concluded that Congress could not issue a patent when the invention had resided in the public domain before the

13

inventor had applied for the patent. For both their Progress Clause and "limited Times" arguments, plaintiffs rely heavily on the *Graham* Court's statement that "Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available." *Id.* at 6. Plaintiffs contend there is no meaningful distinction between copyrights and patents that would prevent this court from applying *Graham* here.

The D.C. Circuit confronted and rejected an identical argument in *Luck's Music Library, Inc. v. Gonzales*, 407 F.3d 1262 (D.C. Cir. 2005), a case in which the plaintiffs maintained that § 514's copyright of works in the public domain violated the Copyright Clause. In rejecting the contention, the D.C. Circuit noted that

> [*Graham*] dealt with patents rather than copyright, and the ideas applicable to one do [not] automatically apply to the other. For example, the *Eldred* Court saw the 'quid pro quo' idea as having a special force in patent law, where the patentee, in exchange for exclusive rights must disclose his 'discoveries' against his presumed will. In contrast, the author is eager to disclose her work.

407 F.3d at 1266.

In addition to these distinctions, the *Eldred* Court observed that while patents "prevent full use by others of the inventor's knowledge," "copyright gives the holder no monopoly on any knowledge." 537 U.S. at 217. We further note that the language plaintiffs cite from *Graham* is taken from a discussion about the

14

Progress Clause in the context of conditions for patentability. The sentence

following the one plaintiffs emphasize reads: "Innovation, advancement, and

things which add to the sum of useful knowledge are inherent requisites in a

*patent system* which by constitutional command must 'promote the Progress of . . .

the useful Arts.'" *Graham*, 383 U.S. at 6 (emphasis supplied). In fact, the

*Graham* Court only mentioned copyright in a footnote when it explained that it

had omitted the copyright portion of the Patent and Copyright Clause because it

was "not relevant" to the disposition of the case. *Id*. at 6 n.1. Thus, we conclude

that plaintiffs have thrust onto *Graham* a burden it was never intended to bear.

We decline to read *Graham* as standing for the proposition that, in the context of

copyright, the public domain is a threshold that Congress may not "traverse in

both directions." Aplts' Br. at 50.

Furthermore, the *Graham* Court emphasized that the Constitution assigns

Congress the task of "implement[ing] the stated purpose of the Framers by

selecting the policy which in its judgment best effectuates the constitutional aim."

383 U.S. at 6. As discussed above, the *Eldred* Court echoed this refrain. *See*

*Eldred*, 537 U.S. at 205 ("[I]t is Congress that has been assigned the task of

defining the scope of the limited monopoly that should be granted to authors . . . in

order to give the public appropriate access to their work product.") (internal

quotation marks omitted). The clear import of *Eldred* is that Congress has

15

expansive powers when it legislates under the Copyright Clause, and this court may not interfere so long as Congress has rationally exercised its authority. *See Eldred*, 237 U.S. at 213 (searching for a "rational basis for the conclusion that the CTEA 'Promotes the Progress of Science'"). Here, we do not believe that the decision to comply with the Berne Convention, which secures copyright protections for American works abroad, is so irrational or so unrelated to the aims of the Copyright Clause that it exceeds the reach of congressional power. *Id.* at 208 (emphasizing that the Court was "not at liberty to second-guess congressional determinations and policy judgments of this order, however debatable or arguably unwise they may be").

Nevertheless, legislation promulgated pursuant to the Copyright Clause must still comport with other express limitations of the Constitution. *Saenz v. Roe*, 526 U.S. 489, 508 (1999) ("Article I of the Constitution grants Congress broad power to legislate in certain areas. Those legislative powers are, however, limited not only by the scope of the Framers' affirmative delegation, but also by the principle that they may not be exercised in a way that violates other specific provisions of the Constitution.") (internal quotation marks omitted); *Buckley v. Valeo*, 424 U.S. 1, 132 (1976) ("Congress has plenary authority in all areas in which it has substantive legislative jurisdiction so long as the exercise of that authority does not offend some other constitutional restriction.") (internal citation

16

omitted).  Thus, even if Congress has not exceeded its Article I authority, § 514 may still be subject to First Amendment review.

2.      **Congress's Removal of Works from the Public Domain Alters the Traditional Contours of Copyright Protection and Requires First Amendment Scrutiny**

We begin our First Amendment analysis by examining the intersection of the Copyright Clause and the First Amendment.  In doing so, we address the *Eldred* Court's holding that the CTEA's extension of existing copyrights did not require First Amendment scrutiny and discuss the Court's suggestion that an act of Congress would only be subject to First Amendment review if it "altered the traditional contours of copyright protection."  537 U.S. at 221.  Based on the *Eldred* Court's analysis, we examine the bedrock principle of copyright law that works in the public domain remain there and conclude that § 514 alters the traditional contours of copyright protection by deviating from this principle.  We then explain how this deviation implicates plaintiffs' First Amendment interest in the works at issue and determine that copyright's two built-in free speech safeguards – the idea/expression dichotomy and the fair use defense – do not adequately protect the First Amendment interests.  Finally, we note that, unlike the CTEA, the URAA does not adopt supplemental free speech safeguards.

a.      *The Copyright Clause & the First Amendment*

It is clear that the Copyright Clause is meant to foster values enshrined in

the First Amendment.  *See Harper & Row*, 471 U.S. at 558 (observing that "the Framers intended copyright itself to be the engine of free expression").  The Clause's primary purpose is to provide authors with incentives to produce works that will benefit the public.  *See id.* at 546 ("The monopoly created by copyright thus rewards the individual author *in order to benefit the public*.") (internal quotation marks omitted) (emphasis supplied); *Aiken*, 422 U.S. at 156 ("The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor.  But the *ultimate aim* is, by this incentive, to stimulate artistic creativity for the general public good.") (emphasis supplied); *Mazer v. Stein*, 347 U.S. 201, 219 (1954) ("The economic philosophy behind the clause empowering Congress to grant [] copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors . . . in '. . . [the] useful Arts.'"); *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.").

In *Eldred*, the connection between the First Amendment and copyright prompted the Court to reject the proposition that "copyrights [are] categorically immune from challenges under the First Amendment."  537 U.S. at 221 (internal quotation marks omitted).  However, under the facts of *Eldred*, copyright's

inherent free speech protections obviated any need for First Amendment review of the CTEA. The Court based this holding on three factors. First, the Court concluded that copyright law's "built-in First Amendment accommodations" – the idea/expression dichotomy and fair use defense – adequately protected the First Amendment interests at stake. *Id.* at 219. Second, the Court reasoned that the plaintiffs had only a trivial interest in the copyrighted works because "[t]he First Amendment securely protects the freedom to make – or decline to make – one's own speech; it bears less heavily when speakers assert the right to make *other people's* speeches." *Id.* at 221 (emphasis supplied). Finally, the Court noted that the CTEA provided supplemental protections to ensure that the Act did not diminish the public's access to protected expression. *Id.* at 220. The Court further indicated that legislation could be subject to First Amendment scrutiny if it "altered the traditional contours of copyright protection." *Id.* at 221.

b. *The principle that works in the public domain remain there is a traditional contour of copyright protection that § 514 alters*

We begin our analysis of § 514 by exploring the traditional contours of copyright protection. The *Eldred* Court did not define the "traditional contours of copyright protection," and we do not find, nor do the parties suggest that the phrase appears in any other federal authority that might shed light on its meaning. Nevertheless, the term seems to refer to something broader than copyright's built-in free speech accommodations.

19

Our understanding of the traditional contours of copyright protection has both a functional and a historical component. With regard to the functional aspect, we note that a contour is "an outline" or "the general form or structure of something." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 284 (1984). Because the term copyright refers to a process as well as a form of intellectual property rights, we assess whether removing a work from the public domain alters the ordinary procedure of copyright protection. Relatedly, we explore the way in which the public domain delimits the scope of copyright protection. In addition, the *Eldred* Court's use of the word "traditional" to modify "contours" suggests that Congress's historical practice with respect to copyright and the public domain must inform our inquiry. Based on these criteria, we conclude that the traditional contours of copyright protection include the principle that works in the public domain remain there and that § 514 transgresses this critical boundary.

i.    Copyright Sequence

Although the specific requirements for perfecting a copyright have changed over the years, the process has always begun when an author generates an original expression. The 1909 Copyright Act required an author seeking protection to attach notice to any distributed copies of his or her work. Moreover, the author could not initiate an infringement action or apply for a renewal unless he or she had formally registered the work with the copyright office. The 1976 Act removed

20

many of the consequences for failure to register or attach notice, and, in 1989, the United States effectively abandoned all formalities as a condition of compliance with the Berne Convention. Thus, today, a limited copyright attaches at the moment a work is created.[3] When the copyright expires at the end of the statutory period, the work becomes part of the public domain. Until § 514, every statutory scheme preserved the same sequence. A work progressed from 1) creation; 2) to copyright; 3) to the public domain. Under § 514, the copyright sequence no longer necessarily ends with the public domain: indeed, it may begin there. Thus, by copyrighting works in the public domain, the URAA has altered the ordinary copyright sequence.

ii.    Public Domain

The significance of the copyright sequence, combined with the principle that no individual may copyright a work in the public domain, is that ordinarily works in the public domain stay there. *See Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1287 (10th Cir. 1996) (holding that a doll design could not be copyrighted because it was characterized by "typical paper doll features found in the public domain"); *Lipton v. Nature Co.*, 71 F.3d 464, 470 (2d Cir. 1995) ("[F]acts are considered to be in the public domain and therefore not protectable

_____

[3] An author must still include notice in order to defend against "innocent infringer[s]." GORMAN, *supra*, at 91.

21

under copyright law . . . ."); *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 48 (5th Cir. 1995) (holding that certain flowers could not be copyrighted "because these same flowers already existed in the public domain"); *United States v. Hamilton*, 583 F.2d 448, 450 (9th Cir. 1987) (noting that "a map which represents a new combination of information already in the public domain lacks any element worthy of copyright protection"); *M.M. Bus. Forms Corp. v. Uarco, Inc.*, 472 F.2d 1137, 1140 (6th Cir. 1973) ("Elementary legal words and phrases are in the public domain and no citizen may gain monopoly thereover to the exclusion of their use by other citizens."); *Amsterdam v. Triangle Publ'ns, Inc.*, 189 F.2d 104, 106 (3d Cir. 1951) ("The location of county lines, township lines and municipal lines is information within the public domain, and is not copyrightable."); *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945) ("The outline map of the United States with state boundaries is in the public domain and is not copyrightable.") (internal quotation marks omitted); *Meade v. United States*, 27 Fed. Cl. 367, 372 (1992) (holding that "defendant's LOVE stamp" could not be copyrighted because it "exist[ed] in the public domain"); *see also Toro Co. v. R&R Prods. Co.*, 787 F.2d 1208, 1213 (8th Cir. 1908) ("If the disputed work is similar to a pre-existing protected work or one in the public domain, the second work must contain some variation recognizable as that of the second author.").

In *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir. 1936),

22

*aff'd*, 309 U.S. 390, 392 (1940), Judge Learned Hand, a luminary in the field of copyright law, illustrated this principle when he stated that "if by some magic a man who had never known it were to compose anew Keats's Ode on a Grecian Urn, he would be an 'author,' and, if he copyrighted it, others might not copy that poem, though they might of course copy Keats." *Sheldon*, 81 F.2d at 54. As Judge Hand observed, Keats's poems remained in the public domain – free for anyone to copy – even if someone copyrighted the identical language. Section 514 contravenes this principle.

      iii.    <u>The history of American copyright law reveals no tradition of copyrighting works in the public domain</u>

As we stated above, the fact that the *Eldred* Court used the word "traditional" to modify "contours" suggests that the history of American copyright law should inform our inquiry. *Eldred*, 537 U.S. at 221. Accordingly, we look for evidence indicating that the Framers believed removal of works from the public domain was consistent with the copyright scheme they designed. Congress's past practices are also pertinent to determining whether extricating works from the public domain is a tradition of our country's copyright law.

      a.    **The Framers' Views**

Unfortunately, constitutional historians know little about the Framers' views regarding copyright and the public domain. In part, this is because, when the states ratified the Constitution, "the Common Law of the United States . . . was

23

in a highly uncertain state on the subject of copyrights." 1 William W. Crosskey, POLITICS AND THE CONSTITUTION IN THE HISTORY OF THE UNITED STATES 477 (1953). Uncertainty also stems from the fact that none of the usual, reliable sources – The Federalist Papers, Madison's notes from the Constitutional Convention, or accounts of the First Congress's deliberations – take up the subject in any detail.

Passed in 1790, the first Copyright Act granted fourteen years of protection for books, maps, and charts already printed in the United States. *See Eldred*, 537 U.S. at 194 (discussing the 1790 Act). The parties debate whether the First Congress extended copyright protection to works already in the public domain. While the *Eldred* Court recognized that "the First Congress clearly did confer copyright protection on works that had already been created," *id.* at 196 n.3, plaintiffs argue convincingly that most, if not all, of these works were covered by a *state* common-law copyright and therefore not in the public domain. In response, the government observes that not all states enacted copyright statutes during the period of the Articles of Confederation. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 350 (1998) (citing Copyright Enactments: Laws Passed in the United States Since 1783 Relating to Copyright 21 (Copyright Office ed., Bulletin No. 3, rev. 1963)); Thomas B. Nachbar, *Intellectual Property and Constitutional Norms*, 104 Colum. L. Rev. 272, 338 n.284 (2004) ("Of the

24

general copyright laws passed by the States during the years of the Articles of Confederation, two of them (Maryland and Pennsylvania) never even came into effect; they included reciprocity clauses that were never fulfilled because one State, Delaware, never enacted a general copyright law . . . .").

Although the history of the 1790 Act could be highly informative of the Framers' views, the answer to the question of whether Congress thought it was removing works from the public domain is probably not just unclear but also unknowable. Edward C. Walterscheid, *Understanding the Copyright Act of 1790: the Issue of Common Law Copyright in America and the Modern Interpretation of the Copyright Power*, 53 J. Copyright Soc'y U.S.A. 313, 332 (2006) ("There is very little contemporaneous legislative history dealing with the 1790 Act."); *see also id.* at 340 ("[I]t is impossible to demonstrate with any reasonable certainty from the language of the 1790 Copyright Act and the circumstances surrounding its enactment that Congress believed that it was creating a property right in authors rather than affirming and protecting an existing common-law right, albeit for a limited time.").

Given the scarcity of historical evidence, we cannot conclude that the Framers viewed removal of works from the public domain as consistent with the copyright scheme they created. Nor do we discern at the dawn of the Republic any burgeoning tradition of removing works from the public domain.

25

### b. _____Congressional Practice Since the First Congress

At oral argument, the government conceded that apart from the 1790 Act's purported grant of copyright protection to works in the public domain, there have been few instances of such grants since. It does, however, point to a series of private bills granting copyrights to individuals. But "[t]hese private bills do not support the [government's] historical gloss, but rather significantly undermine the historical claim." _Eldred_, 537 U.S. at 234 (Stevens, J., dissenting). Far from providing evidence that copyrighting works in the public domain is within the traditional contours of copyright protection, the fact that individuals were forced to resort to the uncommon tactic of petitioning Congress demonstrates that this practice was _outside_ the normal practice.

In addition, the government argues that the wartime acts of Dec 18, 1919, Pub. L. No. 66-102, 41 Stat. 368, and the Emergency Copyright Act of 1941, Pub. L. No. 77-258, 55 Stat. 732, removed works from the public domain by granting the President authority to give foreign authors additional time to comply with copyright requirements. However, a review of the historical record reveals that these emergency wartime bills, passed in response to exigent circumstances, merely altered the means by which authors could comply with the procedural rules for copyright; these bills were not explicit attempts to remove works from the public domain. The Emergency Copyright Act of 1941, for example, recognized

26

that authors "may have been *temporarily unable to comply* with [copyright formalities] because of the disruption or suspension of facilities essential for such compliance." 55 Stat. 732 (emphasis supplied).

The statutory context of these acts reveals that they were, at most, a brief and limited departure from a practice of guarding the public domain. In previous actions granting copyrights to foreign authors, Congress emphasized that it was not attempting to interfere with the rights of Americans who had relied on the foreign works. For example, the 1919 Act stated that "nothing herein contained shall be construed to deprive any person of any right which he may have acquired by the republication of such foreign work in the United States prior to approval of this Act." 41 Stat. 369. One of the Acts to which the 1919 Act referred was the 1909 Copyright Act. That Act made clear that "no copyright shall subsist in the original text of any work which is *in the public domain*." Copyright Act, Pub. L. No. 60-349, 35 Stat. 1075, 1077 (1909) (emphasis supplied).

This context notwithstanding, the wartime acts may have had the effect of removing a very small number of works from the public domain. Nevertheless, this possibility is insufficient to establish a traditional contour of copyright law. Indeed, world war is (hopefully) not traditional. The fact that the legislation was passed in response to the exigencies of a world war suggests that Congress felt compelled to depart from its normal practice of preserving the public domain.

27

Moreover, the mere passage of these discrete acts does not indicate that such removal was consistent with any provision of the Constitution, including the First Amendment. *See* 3 NIMMER ON COPYRIGHT § 9A.07[A], 9A-79 to -80 (2007) (stating that "although three [wartime] enactments granted very limited resurrection, . . . the practice under those circumscribed enactments was simply to sweep the constitutional issues under the rug").

Based on the foregoing, we see no tradition of removing works from the public domain. Indeed, if anything, our examination of the history of American copyright law reveals that removal was the exception rather than the rule. Thus, § 514 deviates from the time-honored tradition of allowing works in the public domain to stay there.

### iv. Conclusion

In sum, by extending a limited monopoly to expressions historically beyond the pale of such privileges, the URAA transformed the ordinary process of copyright protection and contravened a bedrock principle of copyright law that works in the public domain remain in the public domain. Therefore, under both the functional and historical components of our inquiry, § 514 has altered the traditional contours of copyright protection.

### c. *The URAA's removal of works from the public domain implicates plaintiffs' First Amendment interest*

We now explain how this alteration of traditional contours affects the First

28

Amendment interests of these plaintiffs. To begin, as discussed above, copyright law bears out the rather obvious – but significant – point that works in the public domain belong to the public. *See Dastar*, 539 U.S. at 33-34 (2003) ("[O]nce the . . . copyright monopoly has expired, the public may use the . . . work at will and without attribution."); *Am. Tobacco Co. v. Werckmeister*, 207 U.S. 284, 299-300 (1907) (observing that widespread publication of a work without copyright protection "render[s] such work *common property*") (emphasis supplied). As Judge Hand made clear in *National Comics Publications, Inc. v. Fawcett Publications, Inc.*, 171 F.2d 594, 603 (2d Cir. 1951), a case that involved copyrights to "Superman" and "Captain Marvel" comic strips, "once [the strips fell] into the public domain . . . *anyone might copy them*." In other words, each member of the public – "anyone" – has a non-exclusive right, subject to constitutionally permissible legislation, to use material in the public domain. The implication of this principle is that the plaintiffs here possessed a non-exclusive right to use the works at issue.

Furthermore, the First Amendment protects plaintiffs' right to unrestrained artistic use of these works. The Supreme Court has emphasized that the right to artistic expression is near the core of the First Amendment. *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) ("Music is one of the oldest forms of human expression. From Plato's discourse in the Republic to the totalitarian state in our

29

own times, rulers have known [music's] capacity to appeal to the intellect and to the emotions, and have censored musical compositions to serve the needs of the state. . . . The Constitution prohibits any like attempts in our own legal order. Music, as a form of expression and communication, is protected under the First Amendment."); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee."); *Kaplan v. California*, 413 U.S. 115, 119-120 (1973) ("[P]ictures, films, paintings, drawings, and engravings . . . have First Amendment protection . . . .").

Together, the clear import of these principles is that the public in general and these plaintiffs in particular have a First Amendment interest in using works in the public domain. For example, at the moment that Dmitri Shostakovich's *Symphony No. 5* entered the public domain, Plaintiff John Blackburn had a right to create a derivative work for a high school band to perform at an event commemorating 9/11. The principle of copyright law that shields works in the public domain from copyright ensured Mr. Blackburn's right to create the piece, and the First Amendment protected his right to perform it.

Section 514 has interfered with Mr. Blackburn's right by making the cost of performance or creation of new derivative works based on Shostakovich's

*Symphony No. 5* prohibitive.  Moreover, as the example of Mr. Blackburn's composition suggests, plaintiffs' First Amendment interests in public domain works are greater than the interests of the *Eldred* plaintiffs.  The *Eldred* plaintiffs did not – nor had they ever – possessed unfettered access to any of the works at issue there.  As the *Eldred* Court observed, the most the *Eldred* plaintiffs could show was a weak interest in "making other people's speeches."  537 U.S. 221.  By contrast, the speech at issue here belonged to plaintiffs when it entered the public domain.  In reliance on their rights to these works, plaintiffs have already performed or planned future performances and used these publically available works to create their own artistic productions.[4]

By removing works from the public domain, § 514 arguably hampers free expression and undermines the values the public domain is designed to protect. *See Meade*, 27 Fed. Cl. at 372 ("Extending copyright protection to a heart-shaped picture of earth effectively would grant the copyright holder a monopoly over the

---

[4]  Interestingly, during the *Eldred* oral argument, Justice Souter asked then-Solicitor General Olsen whether the Copyright Clause combined with the Necessary and Proper Clause could justify the extension of monopoly privileges to a "copyright that expired yesterday." Aplts' Supp. Auth. dated June 2, 2006, Transcript of Oral Argument at 44, *Eldred v. Ashcroft*, 537 U.S. 186 (No. 01-618).  The Solicitor General replied that although such an act was not inconceivable, the public domain likely presented a "bright line" because once "[s]omething . . . has already gone into the public domain [] other individuals or companies or entities may then have acquired an interest in, or rights to be involved in disseminating [the work.]" *Id.*

innumerable ways of expressing this picture. Allowing this picture to remain in the public domain for all artists to interpret freely, however, will foster creativity by ensuring that future mapmakers and artists have an ample store of ideas on which to build their works."). We therefore conclude that once the works at issue became free for anyone to copy, plaintiffs in this case had vested First Amendment interests in the expressions, and § 514's interference with plaintiffs' rights is subject to First Amendment scrutiny.

f.      *Copyright's built-in free speech safeguards are not adequate to protect the First Amendment interests at stake*

In *Eldred*, the Court indicated that "copyright's built-in free speech safeguards are *generally* adequate to address [First Amendment concerns]." 537 U.S. at 221 (emphasis supplied). Below, we conclude that the idea/expression dichotomy and the fair use defense are not designed to combat the threat to free expression posed by § 514's removal of works from the public domain.

i.      Idea/Expression Dichotomy

The idea/expression dichotomy protects First Amendment interests by ensuring that "no author may copyright facts or ideas. The copyright is limited to those aspects of the work – termed 'expression' – that display the stamp of the author's originality." *Harper & Row*, 471 U.S. at 547 (citation omitted). The Supreme Court has observed that the idea/expression dichotomy "strikes a definitional balance between the First Amendment and the Copyright Act by

32

permitting free communication of facts while still protecting an author's expression." *Eldred*, 537 U.S. at 219 (quoting *Harper*, 471 U.S. at 556). *See* 4 NIMMER ON COPYRIGHT, *supra*, § 19E.03[A][2], at 19E-20 to -21 ("In general, the democratic dialogue – a self-governing people's participation in the marketplace of ideas – is adequately served if the public has access to an author's ideas, and such loss to the dialogue as results from inaccessibility to an author's 'expression' is counterbalanced by the greater public interest in the copyright system.").

However, the idea/expression dichotomy's utility as a definitional mechanism is limited to determining whether a proposed work is an idea or whether the work displays sufficient originality to constitute an expression. In the typical case, the danger to free speech interests is that an individual might gain monopoly privileges over an idea. Here, by contrast, there is no doubt that the works at issue are expressions; the threat to free expression lies not in what is being copyrighted, but in the fact that the works are being removed from the public domain. The idea/expression dichotomy is simply not designed to determine whether Congress's grant of a limited monopoly over an expression in the public domain runs afoul of the First Amendment.

ii.    Fair Use Defense

"The [fair use] defense provides: the fair use of a copyrighted work, including such use by reproduction in copies . . . , for purposes such as criticism,

33

comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107 (internal quotation marks omitted). "[It] allows the public to use not only facts and ideas contained in a copyrighted work, but also expression itself in certain circumstances." *Eldred*, 537 U.S. at 219. For example, although Ralph Ellison's estate may retain the copyright to his classic novel *Invisible Man*, the fair use defense permits scholars and teachers to quote extensively from the book and even reproduce entire sections for the purpose of commenting on (say) the parallels between the narrator's literal and figurative vision. Because the purpose of the fair use defense is to "afford[] considerable 'latitude for scholarship and comment,'" *Eldred*, 537 U.S. at 220 (quoting *Harper*, 471 U.S. at 560), the Court has described it as a "guarantee of breathing space within the confines of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).

In our view, the fair use doctrine is not a sufficient safeguard of plaintiffs' First Amendment interests. Although the doctrine allows limited use of copyrighted works, it does not address works that have entered the public domain and are therefore available for unrestricted use. By withdrawing works from the public domain, § 514 leaves scholars, artists, and the public with less access to works than they had before the Act. The fact that the fair use doctrine permits some access to those works may not be an adequate substitute for the unlimited

34

access enjoyed before the URAA was enacted. Thus, instead of providing additional "breathing space" for free expression, the fair use defense suggests that § 514 infringes upon plaintiffs' First Amendment rights.

In sum, "copyright's built-in free speech safeguards," *Eldred*, 537 U.S. at 221, are designed to govern the distribution of rights between authors and the public from the moment a work is created and copyrighted until the copyright expires. This design presumes that some rights are properly reserved for the author who has never relinquished his right to exploitation. Once a work has entered the public domain, however, neither the author nor the author's estate possesses any more right to the work than any member of the general public. Because § 514 bestows copyrights upon works in the public domain, these built-in safeguards are not adequate to protect plaintiffs' First Amendment interests.

#### iii. The URAA does not supplement the traditional First Amendment safeguards

In concluding that the CTEA did not require First Amendment scrutiny, the *Eldred* Court noted that "the CTEA [] supplements the[] traditional safeguards." *Id.* The Court described the additional protections as follows:

> First, [the CTEA] allows libraries, archives, and similar institutions to "reproduce" and "distribute, display, or perform in facsimile or digital form" copies of certain published works "during the last 20 years of any term of copyright . . . for purposes of preservation, scholarship, or research" if the work is not already being exploited commercially and further copies are unavailable at a reasonable price. 17 U.S.C. § 108(h). Second, Title II of the CTEA, known as the Fairness in Music Licensing

35

Act of 1998, exempts small businesses, restaurants, and like entities from having to pay performance royalties on music played from licensed radio, television, and similar facilities.

*Id.* at 220 (quoting 17 U.S.C. § 108(h)) (some internal citations omitted).

The URAA contains none of the CTEA's supplemental First Amendment protections. It neither provides exceptions for "libraries, archives and similar institutions," nor exemptions for "small businesses, restaurants and like entities from having to pay performance royalties." 17 U.S.C. § 108(h). Rather than excepting parties, such as plaintiffs, who have relied upon works in the public domain, the URAA provides only a safe harbor allowing a party to use a restored work for one year after receiving notice of the restored copyright protection. 17 U.S.C. § 104A(d)(2). We note, however, that it does permit a party to continue to use a work if notice is not given. *See Luck's Music*, 467 F.3d at 1265 (discussing § 104A(d)(2)). When compared to the CTEA, this is hardly a "guarantee of breathing space." *Campbell*, 510 U.S. at 579.

## IV. INSTRUCTIONS FOR REMAND

In conducting its First Amendment analysis on remand, the district court should assess whether § 514 is content-based or content-neutral. Content-based restrictions on speech are those which "suppress, disadvantage, or impose differential burdens upon speech because of its content." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 657 (10th Cir. 2006) (internal citations

36

and quotations omitted). These restrictions "are subject to the most exacting scrutiny." *Id.* If § 514 is a content-based restriction, then the district court will need to consider whether the government's interest in promulgating the legislation is truly "compelling" and whether the government might achieve the same ends through alternative means that have less of an effect on protected expression.[5] *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). By contrast, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Rock Against Racism*, 491 U.S. at 791. A content-

---

[5] Although not mentioned by the parties, Congress's treaty, commerce, and takings powers may provide Congress with the authority to enact § 514. *See* 3 NIMMER ON COPYRIGHT § 9A.07[B], 9A-79 to -80, 90A.07[C], 9A-85. We also note that at oral argument, Professor Lessig claimed that the experience of other countries, such as the United Kingdom, suggests that the United States could comply with the Berne Convention through less restrictive means. Indeed, the United Kingdom Copyright Statute, as well as the statutes in Australia, Canada, India, and New Zealand, define a reliance party as any person who "incurs or has incurred any expenditure or liability in connection with, for the purpose of or with a view to the doing of an act which at the time is not or was not an act restricted by any copyright in the work." Irwin Karp, *Final Report, Berne Article 18 Study on Retroactive United States Copyright Protection for Berne and Other Works*, 20 COLUM.-VLA J.L. & Arts 157, 178 (Winter 1996) (quoting "The Copyright (Application to Other Countries) Order in Council 988"; June 13, 1989, Article 7(2), reprinted in Copyright Laws and Treaties of the World, UK: Item 7c, at 2 (Unesco Supp. 1989-1990). Under the British, Canadian, Australian, and Indian systems, "the reliance party is allowed to continue making those uses of the work it had made, or incurred commitments to make, before its copyright is restored. But the reliance party can be 'bought out' by the owner of the restored copyright. That is, the reliance party must cease exploiting the work if the owner pays compensation, in an amount to be determined by negotiation or arbitration." *Id.*

neutral restriction must be "narrowly tailored to serve a significant governmental interest." *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

## V. CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of the CTEA claim as foreclosed by *Eldred*. We also affirm the district court's holding that § 514 of the URAA does not exceed the limitations inherent in the Copyright Clause. Nevertheless, since § 514 has altered the traditional contours of copyright protection in a manner that implicates plaintiffs' right to free expression, it must be subject to First Amendment review. We therefore REMAND for proceedings consistent with this opinion.