Justice Ginsburg
delivered the opinion of the Court.
The Berne Convention for the Protection of Literary and Artistic Works (Berne Convention, Convention, or Berne), which took effect in 1886, is the principal accord governing *307 international copyright relations. Latecomer to the international copyright regime launched by Berne, the United States joined the Convention in 1989. To perfect U. S. implementation of Berne, and as part of our response to the Uruguay round of multilateral trade negotiations, Congress, in 1994, gave works enjoying copyright protection abroad the same full term of protection available to U. S. works. Congress did so in § 514 of the Uruguay Round Agreements Act (URAA), which grants copyright protection to preexisting works of Berne member countries, protected in their country of origin, but lacking protection in the United States for any of three reasons: The United States did not protect works from the country of origin at the time of publication; the United States did not protect sound recordings fixed before 1972; or the author had failed to comply with U. S. statutory formalities (formalities Congress no longer requires as prerequisites to copyright protection).
The URAA accords no protection to a foreign work after its full copyright term has expired, causing it to fall into the public domain, whether under the laws of the country of origin or of this country. Works encompassed by §514 are granted the protection they would have enjoyed had the United States maintained copyright relations with the author’s country or removed formalities incompatible with Berne. Foreign authors, however, gain no credit for the protection they lacked in years prior to §514’s enactment. They therefore enjoy fewer total years of exclusivity than do their U. S. counterparts. As a consequence of the barriers to U. S. copyright protection prior to the enactment of § 514, foreign works “restored” to protection by the measure had entered the public domain in this country. To cushion the impact of their placement in protected status, Congress included in § 514 ameliorating accommodations for parties who had exploited affected works before the URAA was enacted.
Petitioners include orchestra conductors, musicians, publishers, and others who formerly enjoyed free access to *308 works § 514 removed from the public domain. They maintain that the Constitution’s Copyright and Patent Clause, Art. I, § 8, cl. 8, and First Amendment both decree the invalidity of § 514. Under those prescriptions of our highest law, petitioners assert, a work that has entered the public domain, for whatever reason, must forever remain there.
In accord with the judgment of the Tenth Circuit, we conclude that § 514 does not transgress constitutional limitations on Congress’ authority. Neither the Copyright and Patent Clause nor the First Amendment, we hold, makes the public domain, in any and all cases, a territory that works may never exit.
I
A
Members of the Berne Union agree to treat authors from other member countries as well as they treat their own. Berne Convention, Sept. 9, 1886, as revised at Stockholm on July 14, 1967, Arts. 1, 5(1), 828 U. N. T. S. 221, 225, 231-233. Nationals of a member country, as well as any author who publishes in one of Berne’s 164 member states, thus enjoy copyright protection in nations across the globe. Arts. 2(6), 3. Each country, moreover, must afford at least the minimum level of protection specified by Berne. The copyright term must span the author’s lifetime, plus at least 50 additional years, whether or not the author has complied with a member state’s legal formalities. Arts. 5(2), 7(1). And, as relevant here, a work must be protected abroad unless its copyright term has expired in either the country where protection is claimed or the country of origin. Art. 18(l)-(2).[1]
*309 A different system of transnational copyright protection long prevailed in this country. Until 1891, foreign works were categorically excluded from Copyright Act protection. Throughout most of the ,20th century, the only eligible foreign authors were those whose countries granted reciprocal rights to U. S. authors and whose works were printed in the United States. See Act of Mar. 3, 1891, §§ 3, 13, 26 Stat. 1107,1110; Patry, The United States and International Copyright Law, 40 Houston L. Rev. 749, 750 (2003).[2] For domestic and foreign authors alike, protection hinged on compliance with notice, registration, and renewal formalities.
The United States became party to Berne’s multilateral, formality-free copyright regime in 1989. Initially, Congress adopted a “minimalist approach” to compliance with the Convention. H. R. Rep. No. 100-609, p. 7 (1988) (hereinafter BCIA House Report). The Berne Convention Implementation Act of 1988 (BCIA), 102 Stat. 2853, made “only those changes to American copyright law that [were] clearly re *310 quired under the treaty’s provisions,” BCIA House Report, at 7. Despite Berne’s instruction that member countries— including “new accessions to the Union” — protect foreign works under copyright in the country of origin, Art. 18(1) and (4), 828 U. N. T. S., at 251, the BCIA accorded no protection for “any work that is in the public domain in the United States,” § 12, 102 Stat. 2860. Protection of future foreign works, the BCIA indicated, satisfied Article 18. See § 2(3), 102 Stat. 2853 (“The amendments made by this Act, together with the law as it exists on the date of the enactment of this Act, satisfy the obligations of the United States in adhering to the Berne Convention . . . .”). Congress indicated, however, that it had not definitively rejected “retroactive” protection for pre-existing foreign works; instead it had punted on this issue of Berne’s implementation, deferring consideration until “a more thorough examination of Constitutional, commercial, and consumer considerations is possible.” BCIA House Report, at 51, 52.[3]
*311 The minimalist approach essayed by the United States did not sit well with other Berne members.[4] While negotiations were ongoing over the North American Free Trade Agreement (NAFTA), Mexican authorities complained about the United States’ refusal to grant protection, in accord with Article 18, to Mexican works that remained under copyright domestically. See Intellectual Property and International Issues, Hearings before the Subcommittee on Intellectual Property and Judicial Administration, House Committee on the Judiciary, 102d Cong., 1st Sess., 168 (1991) (statement of Ralph Oman, U. S. Register of Copyrights).[5] The Register of Copyrights also reported “questions” from Turkey, Egypt, and Austria. Ibid. Thailand and Russia balked at proteet- *312 ing U. S. works, copyrighted here but in those countries’ public domains, until the United States reciprocated with respect to their authors’ works. URAA Joint Hearing 137 (statement of Ira S. Shapiro, General Counsel, Office of the U. S. Trade Representative (USTR)); id., at 208 (statement of Professor Shira Perlmutter); id., at 291 (statement of Jason S. Berman, Recording Industry Association of America (RIAA)).[6]
Berne, however, did not provide a potent enforcement mechanism. The Convention contemplates dispute resolution before the International Court of Justice. Art. 33(1). But it specifies no sanctions for noncompliance and allows parties, at any time, to declare themselves “not . . . bound” by the Convention’s dispute resolution provision. Art. 33(2)-(3), 828 U. N. T. S., at 277. Unsurprisingly, no enforcement actions were launched before 1994. D. Gervais, The TRIPS Agreement 213, and n. 134 (3d ed. 2008). Although “several Berne Union Members disagreed with [our] interpretation of Article 18,” the USTR told Congress, the Berne Convention did “not provide a meaningful dispute resolution process.” URAA Joint Hearing 137 (statement of Shapiro). This shortcoming left Congress “free to adopt a minimalist approach and evade Article 18.” Karp, Pinal Report, Berne Article 18 Study on Retroactive United States Copyright Protection for Berne and other Works, 20 Colum.-VLA J. L. & Arts 157, 172 (1996).
The landscape changed in 1994. The Uruguay round of multilateral trade negotiations produced the World Trade Organization (WTO) and the Agreement on Trade-Related *313 Aspects of Intellectual Property Rights (TRIPS).[7] The United States joined both. TRIPS mandates, on pain of WTO enforcement, implementation of Berne’s first 21 articles. TRIPS, Art. 9.1, 33 I. L. M. 1197, 1201 (requiring adherence to all but the “moral rights” provisions of Article 6bis). The WTO gave teeth to the Convention’s requirements: Noncompliance with a WTO ruling could subject member countries to tariffs or cross-sector retaliation. See Gervais, supra, at 213; 7 W. Patry, Copyright §24:1, pp. 24-8 to 24-9 (2011). The specter of WTO enforcement proceedings bolstered the credibility of our trading partners’ threats to challenge the United States for inadequate compliance with Article 18. See URAA Joint Hearing 137 (statement of Shapiro, USTR) (“It is likely that other WTO members would challenge the current U. S. implementation of Berne Article 18 under [WTO] procedures.”).[8]
Congress’ response to the Uruguay agreements put to rest any questions concerning U. S. compliance with Article 18. Section 514 of the URAA, 108 Stat. 4976 (codified at 17 U. S. C. § 104A, 109(a)),[9] extended copyright to works that *314 garnered protection in their countries of origin,[10] but had no right to exclusivity in the United States for any of three reasons: lack of copyright relations between the country of origin and the United States at the time of publication; lack of subject-matter protection for sound recordings fixed before 1972; and failure to comply with U. S. statutory formalities (e.g., failure to provide notice of copyright status, or to register and renew a copyright). See § 104A(h)(6)(B)-(C).[11]
*315 Works that have fallen into the public domain after the expiration of a full copyright term — either in the United States or the country of origin — receive no further protection under §514. Ibid,[12] Copyrights “restored”[13] under URAA § 514 “subsist for the remainder of the term of copyright that the work would have otherwise been granted ... if the work never entered the public domain.” § 104A(a)(l)(B). Prospectively, restoration places foreign works on an equal footing with their U. S. counterparts; assuming a foreign and domestic author died the same day, their works will enter the public domain simultaneously. See § 302(a) (copyrights generally expire 70 years after the author’s death). Restored works, however, receive no compensatory time for the period of exclusivity they would have enjoyed before §514’s enactment, had they been protected at the outset in the United States. Their total term, therefore, falls short of that available to similarly situated U. S. works.
The URAA’s disturbance of the public domain hardly escaped Congress’ attention. Section 514 imposed no liability for any use of foreign works occurring before restoration. In addition, anyone remained free to copy and use restored *316 works for one year following §514⅛ enactment. See 17 U. S. C. § 104A(h)(2)(A). Concerns about § 514⅛ compatibility with the Fifth Amendment’s Takings Clause led Congress to include additional protections for “reliance parties”— those who had, before the URAA’s enactment, used or acquired a foreign work then in the public domain. See § 104A(h)(3)-(4).[14] Reliance parties may continue to exploit a restored work until the owner of the restored copyright gives notice of intent to enforce — either by filing with the U. S. Copyright Office within two years of restoration, or by actually notifying the reliance party. § 104A(c), (d)(2)(A)(i), and (B)(i). After that, reliance parties may continue to exploit existing copies for a grace period of one year. § 104A(d)(2)(A)(ii) and (B)(ii). Finally, anyone who, before the URAA’s enactment, created a “derivative work” based on a restored work may indefinitely exploit the derivation upon payment to the copyright holder of “reasonable compensation,” to be set by a district judge if the parties cannot agree. § 104A(d)(3).
B
In 2001, petitioners filed this lawsuit challenging §514. They maintain that Congress, when it passed the URAA, exceeded its authority under the Copyright Clause and transgressed First Amendment limitations.[15] The District *317 Court granted the Attorney General’s motion for summary judgment. Golan v. Gonzales, No. Civ. Ol-B-1854, 2005 WL 914754 (D Colo., Apr. 20, 2005). In rejecting petitioners’ Copyright Clause argument, the court stated that Congress “has historically demonstrated little compunction about removing copyrightable materials from the public domain.” Id., at *14. The court next declined to part from “the settled rule that private censorship via copyright enforcement does not implicate First Amendment concerns.” Id., at *17.
The Court of Appeals for the Tenth Circuit affirmed in part. Golan v. Gonzales, 501 F. 3d 1179 (2007). The public domain, it agreed, was not a “threshold that Congress” was powerless to “traverse in both directions.” Id., at 1187 (internal quotations marks omitted). But §514, as the Court of Appeals read our decision in Eldred v. Ashcroft, 537 U. S. 186 (2003), required further First Amendment inspection, 501 F. 3d, at 1187. The measure “‘altered the traditional contours of copyright protection,’ ” the court said— specifically, the “bedrock principle” that once works enter the public domain, they do not leave. Ibid, (quoting Eldred, 537 U. S., at 221). The case was remanded with an instruction to the District Court to address the First Amendment claim in light of the Tenth Circuit’s opinion.
On remand, the District Court’s starting premise was un-eontested: Section 514 does not regulate speech on the basis of its content; therefore the law would be upheld if “narrowly tailored to serve a significant government interest.” 611 F. Supp. 2d 1165, 1170-1171 (Colo. 2009) (quoting Ward v. Rock Against Racism, 491 U. S. 781, 791 (1989)). Summary judgment was due petitioners, the court concluded, because § 514’s constriction of the public domain was not justified by any of the asserted federal interests: compliance with Berne, *318 securing greater protection for U. S. authors abroad, or remediation of the inequitable treatment suffered by foreign authors whose works lacked protection in the United States. 611 F. Supp. 2d, at 1172-1177.
The Tenth Circuit reversed. Deferring to Congress’ predictive judgments in matters relating to foreign affairs, the appellate court held that §514 survived First Amendment scrutiny. Specifically, the court determined that the law was narrowly tailored to fit the important government aim of protecting U. S. copyright holders’ interests abroad. 609 F. 3d 1076 (2010);
We granted certiorari to consider petitioners’ challenge to § 514 under both the Copyright Clause and the First Amendment, 562 U. S. 1270 (2011), and now affirm.
II
We first address petitioners’ argument that Congress lacked authority, under the Copyright Clause, to enact § 514. The Constitution states that “Congress shall have Power .. . [t]o promote the Progress of Science ... by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings.” Art. I, §8, cl. 8. Petitioners find in this grant of authority an impenetrable barrier to the extension of copyright protection to authors whose writings, for whatever reason, are in the public domain. We see no such barrier in the text of the Copyright Clause, historical practice, or our precedents.
A
The text of the Copyright Clause does not exclude application of copyright protection to works in the public domain. Symposium, Congressional Power and Limitations Inherent in the Copyright Clause, 30 Colum. J. L. & Arts 259, 266 (2007). Petitioners’ contrary argument relies primarily on the Constitution’s confinement of a copyright’s lifespan to a “limited Tim[e].” “Removing works from the public domain,” they contend, “violates the ‘limited [t]imes’ restriction *319 by turning a fixed and predictable period into one that can be reset or resurrected at any time, even after it expires.” Brief for Petitioners 22.
Our decision in Eldred is largely dispositive of petitioners’ limited-time argument. There we addressed the question whether Congress violated the Copyright Clause when it extended, by 20 years, the terms of existing copyrights. 537 U. S., at 192-193 (upholding Copyright Term Extension Act (CTEA)). Ruling that Congress acted within constitutional bounds, we declined to infer from the text of the Copyright Clause “the command that a time prescription, once set, becomes forever‘fixed’or‘inalterable.’” Id., at 199. “The word ‘limited,’ ” we observed, “does not convey a meaning so constricted.” Ibid. Rather, the term is best understood to mean “confine[d] within certain bounds,” “restrained],” or “circumscribed.” Ibid, (internal quotation marks omitted). The construction petitioners tender closely resembles the definition rejected in Eldred and is similarly infirm.
The terms afforded works restored by §514 are no less “limited” than those the CTEA lengthened. In light of El-dred, petitioners do not here contend that the term Congress has granted U. S. authors — their lifetimes, plus 70 years— is unlimited. See 17 U. S. C. § 302(a). Nor do petitioners explain why terms of the same duration, as applied to foreign works, are not equally “circumscribed” and “confined.” See Eldred, 537 U. S., at 199. Indeed, as earlier noted, see supra, at 307, 315, the copyrights of restored foreign works typically last for fewer years than those of their domestic counterparts.
The difference, petitioners say, is that the limited time had already passed for works in the public domain. What was that limited term for foreign works once excluded from U. S. copyright protection? Exactly “zero,” petitioners respond. Brief for Petitioners 22 (works in question “received a specific term of protection ... sometimes expressly set to zero”; “at the end of that period,” they “entered the public do *320 main”); Tr. of Oral Arg. 52 (by “refusing to provide any protection for a work,” Congress “set[s] the term at zero,” and thereby “tell[s] us when the end has come”). We find scant sense in this argument, for surely a “limited time” of exclusivity must begin before it may end.[16]
Carried to its logical conclusion, petitioners persist, the Government’s position would allow Congress to institute a second “limited” term after the first expires, a third after that, and so on. Thus, as long as Congress legislated in installments, perpetual copyright terms would be achievable. As in Eldred, the hypothetical legislative misbehavior petitioners posit is far afield from the case before us. See 537 U. S., at 198-200, 209-210. In aligning the United States with other nations bound by the Berne Convention, and thereby according equitable treatment to once disfavored foreign authors, Congress can hardly be charged with a design to move stealthily toward a regime of perpetual copyrights.
B
Historical practice corroborates our reading of the Copyright Clause to permit full U. S. compliance with Berne. Undoubtedly, federal copyright legislation generally has not affected works in the public domain. Section 514⅛ disturbance of that domain, petitioners argue, distinguishes their suit from Eldred’s. In adopting the CTEA, petitioners note, Congress acted in accord with “an unbroken congressional practice” of granting preexpiration term extensions, 537 U. S., at 200. No comparable practice, they maintain, supports §514.
On occasion, however, Congress has seen fit to protect works once freely available. Notably, the Copyright Act of 1790 granted protection to many works previously in the public domain. Act of May 31, 1790 (1790 Act), § 1, 1 *321 Stat. 124 (covering “any map, chart, book, or books already printed within these United States”). Before the Act launched a uniform national system, three States provided no statutory copyright protection at all.[17] Of those that did afford some protection, seven failed to protect maps;[18] eight did not cover previously published books;[19] and all ten denied protection to works that failed to comply with formalities.[20] The First Congress, it thus appears, did not view the public domain as inviolate. As we have recognized, the “construction placed upon the Constitution by [the drafters of] the first [copyright] act of 1790, and the act of 1802 ... men who were contemporary with [the Constitution’s] formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight.” Burrow-Giles Lithographic Co. v. Sarony, 111 U. S. 53, 57 (1884).[21]
*322 Subsequent actions confirm that Congress has not understood the Copyright Clause to preclude protection for existing works. Several private bills restored the copyrights of works that previously had been in the public domain. See Act of Feb. 19, 1849 (Corson Act), ch. 57, 9 Stat. 763; Act of June 23, 1874 (Helmuth Act), ch. 534, 18 Stat. 618; Act of Feb. 17, 1898 (Jones Act), ch. 29, 30 Stat. 1396. These bills were unchallenged in court.
Analogous patent statutes, however, were upheld in litigation.[22] In 1808, Congress passed a private bill restoring patent protection to Oliver Evans’ flour mill. When Evans sued for infringement, first Chief Justice Marshall in the Circuit Court, Evans v. Jordan, 8 F. Cas. 872 (No. 4,564) (Va. 1813), and then Justice Bushrod Washington for this Court, Evans v. Jordan, 9 Craneh 199 (1815), upheld the restored patent’s validity. After the patent’s expiration, the Court said, “a general right to use [Evans’] discovery was not so vested in the public” as to allow the defendant to continue using the machinery, which he had constructed between the patent’s expiration and the bill’s passage. Id., at 202. See also Blanchard v. Sprague, 3 F. Cas. .648, 650 (No. 1,518) (CC Mass. 1839) (Story, J.) (“I never have entertained any doubt of the constitutional authority of congress” to “give a patent for an invention, which . . . was in public use and enjoyed by the community at the time of the passage of the act.”).
This Court again upheld Congress’ restoration of an invention to protected status in McClurg v. Kingsland, 1 How. 202 (1843). There we enforced an 1839 amendment that recognized a patent on an invention despite its prior use by the inventor’s employer. Absent such dispensation, the employer’s use would have rendered the invention unpatentable, *323 and therefore open to exploitation without the inventor’s leave. Id., at 206-209.
Congress has also passed generally applicable legislation granting patents and copyrights to inventions and works that had lost protection. An 1832 statute authorized a new patent for any inventor whose failure, “by inadvertence, accident, or mistake,” to comply with statutory formalities rendered the original patent “invalid or inoperative.” Act of July 3, §3, 4 Stat. 559. An 1893 measure similarly allowed authors who had not timely deposited their work to receive “all the rights and privileges” the Copyright Act affords, if they made the required deposit by March 1, 1893. Act of Mar. 3, ch. 215, 27 Stat. 743.[23] And in 1919 and 1941, Congress authorized the President to issue proclamations granting protection to foreign works that had fallen into the public domain during World Wars I and II. See Act of Dec. 18, 1919, ch. 11, 41 Stat. 368; Act of Sept. 25, 1941, ch. 421, 55 Stat. 732.[24]
Pointing to dictum in Graham v. John Deere Co. of Kansas City, 383 U. S. 1 (1966), petitioners would have us look past this history. In Graham, we stated that “Congress may not authorize the issuance of patents whose effects are *324 to remove existent knowledge from the public domain, or to restrict free access to materials already available.” Id., at 6; post, at 358. But as we explained in Eldred, this passage did not speak to the constitutional limits on Congress’ copyright and patent authority. Rather, it “addressed an invention’s very eligibility for patent protection.” 537 U. S., at 202, n. 7.
Installing a federal copyright system and ameliorating the interruptions of global war, it is true, presented Congress with extraordinary situations. Yet the TRIPS accord, leading the United States to comply in full measure with Berne, was also a signal event. See supra, at 312-313; cf. Eldred, 537 U. S., at 259, 264-265 (Breyer, J., dissenting) (acknowledging importance of international uniformity advanced by U. S. efforts to conform to the Berne Convention). Given the authority we hold Congress has, we will not second-guess the political choice Congress made between leaving the public domain untouched and embracing Berne unstintingly. Cf. id., at 212-213.
C
Petitioners’ ultimate argument as to the Copyright and Patent Clause concerns its initial words. Congress is empowered to “promote the Progress of Science and useful Arts” by enacting systems of copyright and patent protection. U. S. Const., Art. I, §8, el. 8. Perhaps counterintu-itively for the contemporary reader, Congress’ copyright authority is tied to the progress of science; its patent authority, to the progress of the useful arts. See Graham, 383 U. S., at 5, and n. 1; Evans, 8 F. Cas., at 873 (Marshall, J.).
The “Progress of Science,” petitioners acknowledge, refers broadly to “the creation and spread of knowledge and learning.” Brief for Petitioners 21; accord post, at 344-345. They nevertheless argue that federal legislation cannot serve the Clause’s aim unless the legislation “spur[s] the creation of . . . new works.” Brief for Petitioners 24; accord post, at 345, 351, 360. Because § 514 deals solely with works *325 already created, petitioners urge, it “provides no plausible incentive to create new works” and is therefore invalid. Reply Brief 4.[25]
The creation of at least one new work, however, is not the sole way Congress may promote knowledge and learning. In Eldred, we rejected an argument nearly identical to the one petitioners rehearse. The Eldred petitioners urged that the “CTEA’s extension of existing copyrights categorically fails to ‘promote the Progress of Science,’... because it does not stimulate the creation of new works.” 537 U. S., at 211-212. In response to this argument, we held that the Copyright Clause does not demand that each copyright provision, examined discretely, operate to induce new works. Rather, we explained, the Clause “empowers Congress to determine the intellectual property regimes that, overall, in that body’s judgment, will serve the ends of the Clause.” Id., at 222. And those permissible ends, we held, extended beyond the creation of new works. See id., at 205-206 (rejecting the notion that “ ‘the only way to promote the progress of science [is] to provide incentives to create new works’” (quoting Perlmutter, Participation in the International Copyright System as a Means To Promote the Progress of Science and Useful Arts, 36 Loyola (LA) L. Rev. 323, 332 (2002))).[26]
Even were we writing on a clean slate, petitioners’ argument would be unavailing. Nothing in the text of the Copy *326 right Clause confines the “Progress of Science” exclusively to “incentives for creation.” Id., at 324, n. 5 (internal quotation marks omitted). Evidence from the founding, moreover, suggests that inducing dissemination — as opposed to creation — was viewed as an appropriate means to promote science. See Nachbar, Constructing Copyright’s Mythology, 6 Green Bag 2d 37,44 (2002) (“The scope of copyright protection existing at the time of the framing,” trained as it was on “publication, not creation,” “is inconsistent with claims that copyright must promote creative activity in order to be valid.” (internal quotation marks omitted)). Until 1976, in fact, Congress made “federal copyright contingent on publication[,] [thereby] providing incentives not primarily for creation,” but for dissemination. Perlmutter, supra, at 324, n. 5. Our decisions correspondingly recognize that “copyright supplies the economic incentive to create and disseminate ideas.” Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U. S. 539,558 (1985) (emphasis added). See also Eldred, 537 U. S., at 206.[27]
Considered against this backdrop, §514 falls comfortably within Congress’ authority under the Copyright Clause. Congress rationally could have concluded that adherence to Berne “promotes the diffusion of knowledge,” Brief for Petitioners 4. A well-functioning international copyright system would likely encourage the dissemination of existing and future works. See URAA Joint Hearing 189 (statement of Professor Perlmutter). Full compliance with Berne, Congress had reason to believe, would expand the foreign markets available to U. S. authors and invigorate protection against piracy of U. S. works abroad, S. Rep. No. 103-412, pp. 224, 225 (1994); URAA Joint Hearing 291 (statement of Berman, RIA A); id., at 244, 247 (statement of Smith, IIPA), *327 thereby benefiting copyright-intensive industries stateside and inducing greater investment in the creative process.
The provision of incentives for the creation of new works is surely an essential means to advance the spread of knowledge and learning. We hold, however, that it is not the sole means Congress may use “[t]o promote the Progress of Science.” See Perlmutter, supra, at 332 (United States would “lose all flexibility” were the provision of incentives to create the exclusive way to promote the progress of science).[28] Congress determined that exemplary adherence to Berne would serve the objectives of the Copyright Clause. We have no warrant to reject the rational judgment Congress made.
III
A
We next explain why the First Amendment does not inhibit the restoration authorized by § 514. To do so, we first recapitulate the relevant part of our pathmarking decision in Eldred. The petitioners in Eldred, like those here, argued that Congress had violated not only the “limited Times” prescription of the Copyright Clause. In addition, and independently, the Eldred petitioners charged, Congress had offended the First Amendment’s freedom of expression guarantee. The CTEA’s 20-year enlargement of a copyright’s duration, we held in Eldred, offended neither provision.
Concerning the First Amendment, we recognized that some restriction on expression is the inherent and intended *328 effect of every grant of copyright. Noting that the “Copyright Clause and the First Amendment were adopted close in time,” 537 U. S., at 219, we observed that the Framers regarded copyright protection not simply as a limit on the manner in which expressive works may be used. They also saw copyright as an “engine of free expression[:] By establishing a marketable right to the use of one’s expression, copyright supplies the economic incentive to create and disseminate ideas.” Ibid, (quoting Harper & Row, 471 U. S., at 558 (internal quotation marks omitted)); see id., at 546 .(“rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors”).
We then described the “traditional contours” of copyright protection, i. e., the “idea/expression dichotomy” and the “fair use” defense.[29] Both are recognized in our jurisprudence as “built-in First Amendment accommodations.” El-dred, 537 U. S., at 219; see Harper & Row, 471 U. S., at 560 (First Amendment protections are “embodied in the Copyright Act’s distinction between copyrightable expression and uncopyrightable facts and ideas,” and in the “latitude for scholarship and comment” safeguarded by the fair use defense).
The idea/expression dichotomy is codified at 17 U. S. C. § 102(b): “In no case does copyright protec[t] . . . any idea, procedure, process, system, method of operation, concept, principle, or discovery . . . described, explained, illustrated, or embodied in [the copyrighted] work.” “Due to this [idea/ expression] distinction, every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication”; the author’s expression alone gains copyright protection. Eldred, 537 U. S., at 219; see Harper & Row, 471 U. S., at 556 (“idea/expression di *329 chotomy strikefe] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author’s expression” (internal quotation marks omitted)).
The second “traditional contour,” the fair use defense, is codified at 17 U. S. C. § 107: “[T]he fair use of a copyrighted work, including such use by reproduction in copies ... , for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.” This limitation on exclusivity “allows the public to use not only facts and ideas contained in a copyrighted work, but also [the author’s] expression itself in certain circumstances.” Eldred, 537 U. S., at 219; see id., at 220 (“fair use defense affords considerable latitude for scholarship and comment, . . . even for parody” (internal quotation marks omitted)).
Given the “speech-protective purposes and safeguards” embraced by copyright law, see id., at 219, we concluded in Eldred that there was no call for the heightened review petitioners sought in that case.[30] We reach the same conclusion here.[31] Section 514 leaves undisturbed the “idea/ expression” distinction and the “fair use” defense. Moreover, Congress adopted measures to ease the transition from a national scheme to an international copyright regime: It deferred the date from which enforcement runs, and it cushioned the impact of restoration on “reliance parties” who exploited foreign works denied protection before § 514 took effect. See supra, at 315-316 (describing 17 U. S. C. § 104A(c), (d), and (h)). See also Eldred, 537 U. S., at 220 *330 (describing supplemental allowances and exemptions available to certain users to mitigate the CTEA’s impact).
B
Petitioners attempt to distinguish their challenge from the one turned away in Eldred. First Amendment interests of a higher order are at stake here, petitioners say, because they — unlike their counterparts in Eldred — enjoyed “vested rights” in works that had already entered the public domain. The limited rights they retain under copyright law’s “built-in safeguards” are, in their view, no substitute for the unlimited use they enjoyed before §514’s enactment. Nor, petitioners urge, does § 514⅛ “unprecedented” foray into the public domain possess the historical pedigree that supported the term extension at issue in Eldred. Brief for Petitioners 42-43.
However spun, these contentions depend on an argument we considered and rejected above, namely, that the Constitution renders the public domain largely untouchable by Congress. Petitioners here attempt to achieve under the banner of the First Amendment what they could not win under the Copyright Clause: On their view of the Copyright Clause, the public domain is inviolable; as they read the First Amendment, the public domain is policed through heightened judicial scrutiny of Congress’ means and ends. As we have already shown, see supra, at 318-327, the text of the Copyright Clause and the historical record scarcely establish that “once a work enters the public domain,” Congress cannot permit anyone — “not even the creator — [to] copyright it,” 501 F. 3d, at 1184. And nothing in the historical record, congressional practice, or our own jurisprudence warrants exceptional First Amendment solicitude for copyrighted works that were once in the public domain.[32] Neither this chal *331 lenge nor that raised in Eldred, we stress, allege Congress transgressed a generally applicable First Amendment prohibition; we are not faced, for example, with copyright protection that hinges on the author’s viewpoint.
The Tenth Circuit’s initial opinion determined that petitioners marshaled a stronger First Amendment challenge than did their predecessors in Eldred, who never “possessed unfettered access to any of the works at issue.” 501 F. 3d, at 1193. See also id., at 1194 (“[0]nce the works at issue became free for anyone to copy, [petitioners] had vested First Amendment interests in the expressions, [thus] §514’s interference with [petitioners’] rights is subject to First Amendment scrutiny.”). As petitioners put it in this Court, Congress impermissibly revoked their right to exploit foreign works that “belonged to them” once the works were in the public domain. Brief for Petitioners 44-45.
To copyright lawyers, the “vested rights” formulation might sound exactly backwards: Rights typically vest at the outset of copyright protection, in an author or rightholder. See, e. g., 17 U. S. C. § 201(a) (“Copyright in a work protected . . . vests initially in the author . . . .”). Once the term of protection ends, the works do not revest in any rightholder. Instead, the works simply lapse into the public domain. *332 See, e. g., Berne, Art. 18(1), 828 U. N. T. S., at 251 (“This Convention shall apply to all works which . . . have not yet fallen into the public domain . , . .”). Anyone has free access to the public domain, but no one, after the copyright term has expired, acquires ownership rights in the once-protected works.
Congress recurrently adjusts copyright law to protect categories of works once outside the law’s compass. For example, Congress broke new ground when it extended copyright protection to foreign works in 1891, Act of Mar. 3, § 13, 26 Stat. 1110; to dramatic works in 1856, Act of Aug. 18,11 Stat. 138; to photographs and photographic negatives in 1865, Act of Mar. 3, § 1, 13 Stat. 540; to motion pictures in 1912, Act of Aug. 24, 37 Stat. 488; to fixed sound recordings in 1972, Act of Oct. 15, 1971, 85 Stat. 391; and to architectural works in 1990, Architectural Works Copyright Protection Act, 104 Stat. 5133. And on several occasions, as recounted above, Congress protected works previously in the public domain, hence freely usable by the public. See supra, at 320-324. If Congress could grant protection to these works without hazarding heightened First Amendment scrutiny, then what free speech principle disarms it from protecting works prematurely cast into the public domain for reasons antithetical to the Berne Convention?[33]
Section 514, we add, does not impose a blanket prohibition on public access. Petitioners protest that fair use and the idea/expression dichotomy “are plainly inadequate to protect the speech and expression rights that Section 514 took from *333 petitioners, or . . . the public” — that is, “the unrestricted right to perform, copy, teach and distribute the entire work, for any reason.” Brief for Petitioners 46-47. “Playing a few bars of a Shostakovich symphony,” petitioners observe, “is no substitute for performing the entire work.” Id., at 47.[34]
But Congress has not put petitioners in this bind. The question here, as in Eldred, is whether would-be users must pay for their desired use of the author’s expression, or else limit their exploitation to “fair use” of that work. Prokofiev’s Peter and the Wolf could once be performed free of charge; after § 514 the right to perform it must be obtained in the marketplace. This is the same marketplace, of course, that exists for the music of Prokofiev’s U. S. contemporaries: works of Copland and Bernstein, for example, that enjoy copyright protection, but nevertheless appear regularly in the programs of U. S. eoncertgoers.
Before we joined Berne, domestic works and some foreign works were protected under U. S. statutes and bilateral international agreements, while other foreign works were available at an artificially low (because royalty-free) cost. By fully implementing Berne, Congress ensured that most works, whether foreign or domestic, would be governed by the same legal regime. The phenomenon to which Congress responded is not new: Distortions of the same order occurred with greater frequency — and to the detriment of both foreign and domestic authors — when, before 1891, foreign works were excluded entirely from U. S. copyright protection. See Kampelman, The United States and International Copyright, 41 Am. J. Int’l L. 406,413 (1947) (“American readers were less inclined to read the novels of Cooper or Haw *334 thorne for a dollar when they could buy a novel of Scott or Dickens for a quarter.”)- Section 514 continued the trend toward a harmonized copyright regime by placing foreign works in the position they would have occupied if the current regime had been in effect when those works were created and first published. Authors once deprived of protection are spared the continuing effects of that initial deprivation; § 514 gives them nothing more than the benefit of their labors during whatever time remains before the normal copyright term expires.[35]
Unlike petitioners, the dissent makes much of the so-called “orphan works” problem. See post, at 354-357, 366-367. We readily acknowledge the difficulties would-be users of copyrightable materials may face in identifying or locating copyright owners. See generally U. S. Copyright Office, Report on Orphan Works 21-40 (2006). But as the dissent concedes, see post, at 357, this difficulty is hardly peculiar to works restored under §514. It similarly afflicts, for instance, U. S. libraries that attempt to catalogue U. S. books. See post, at 355-356. See also Brief for American Library Association et al. as Amici Curiae 22 (Section 514 “exacerbated,” but did not create, the problem of orphan works); U. S. Copyright Office, supra, at 41-44 (tracing orphan-works problem to Congress’ elimination of formalities, commencing with the 1976 Copyright Act).[36]
Nor is this a matter appropriate for judicial, as opposed to legislative, resolution. Cf. Authors Guild v. Google, Inc., *335 770 E Supp. 2d 666, 677-678 (SDNY 2011) (rejecting proposed “Google Books” class settlement because, inter alia, “the establishment of a mechanism for exploiting unclaimed books is a matter more suited for Congress than this Court” (citing Eldred, 537 U. S„ at 212)). Indeed, the host of policy and logistical questions identified by the dissent speak for themselves. Post, at 355-356. Despite “longstanding efforts,” see Authors Guild, 770 F. Supp. 2d, at 678 (quoting statement of Marybeth Peters), Congress has not yet passed ameliorative orphan-works legislation of the sort enacted by other Berne members, see, e. g., Canada Copyright Act, R. S. C., 1985, c. C-42, § 77 (authorizing Copyright Board to license use of orphan works by persons unable, after making reasonable efforts, to locate the copyright owner). Heretofore, no one has suggested that the orphan-works issue should be addressed through our implementation of Berne, rather than through overarching legislation of the sort proposed in Congress and cited by the dissent. See post, at 366-367; U. S. Copyright Office, Legal Issues in Mass Digitization 25-29 (2011) (discussing recent legislative efforts). Our unstinting adherence to Berne may add impetus to calls for the enactment of such legislation. But resistance to Berne’s prescriptions surely is not a necessary or proper response to the pervasive question, what should Congress do about orphan works.
IV
Congress determined that U. S. interests were best served by our full participation in the dominant system of international copyright protection. Those interests include ensuring exemplary compliance with our international obligations, securing greater protection for U. S. authors abroad, and remedying unequal treatment of foreign authors. The judgment § 514 expresses lies well within the ken of the political branches. It is our obligation, of course, to determine whether the action Congress took, wise or not, encounters any constitutional shoal. For the reasons stated, we are sat *336 isfied it does not. The judgment of the Court of Appeals for the Tenth Circuit is therefore

Affirmed.

Justice Kagan took no part in the consideration or decision of this case.
APPENDIX
Title 17 U. S. C. § 104A provides:
“(a) Automatic Protection and Term.—
“(1) Term.—
“(A) Copyright subsists, in accordance with this section, in restored works, and vests automatically on the date of restoration.
“(B) Any work in which copyright is restored under this section shall subsist for the remainder of the term of copyright that the work would have otherwise been granted in the United States if the work never entered the public domain in the United States.
“(2) Exception. — Any work in which the copyright was ever owned or administered by the Alien Property Custodian and in which the restored copyright would be owned by a government or instrumentality thereof, is not a restored work.
“(b) Ownership OF Restored Copyright. — A restored work vests initially in the author or initial rightholder of the work as determined by the law of the source country of the work.
“(c) Filing of Notice of Intent to Enforce Restored Copyright Against Reliance Parties. — On or after the date of restoration, any person who owns a copyright in a restored work or an exclusive right therein may file with the Copyright Office a notice of intent to enforce that person’s copyright or exclusive right or may serve such a notice directly on a reliance party. Acceptance of a notice by the *337 Copyright Office is effective as to any reliance parties but shall not create a presumption of the validity of any of the facts stated therein. Service on a reliance party is effective as to that reliance party and any other reliance parties with actual knowledge of such service and of the contents of that notice.
“(d) Remedies for Infringement of Restored Copyrights.—
“(1) Enforcement of copyright in restored works IN THE ABSENCE OF A RELIANCE PARTY. — As against any party who is not a reliance party, the remedies provided in chapter 5 of this title shall be available on or after the date of restoration of a restored copyright with respect to an act of infringement of the restored copyright that is commenced on or after the date of restoration.
“(2) Enforcement of copyright in restored works as against reliance parties. — As against a reliance party, except to the extent provided in paragraphs (3) and (4), the remedies provided in chapter 5 of this title shall be available, with respect to an act of infringement of a restored copyright, on or after the date of restoration of the restored copyright if the requirements of either of the following sub-paragraphs are met:
“(A)(i) The owner of the restored copyright (or such owner’s agent) or the owner of an exclusive right therein (or such owner’s agent) files with the Copyright Office, during the 24-month period beginning on the date of restoration, a notice of intent to enforce the restored copyright; and
“(ii)(I) the act of infringement commenced after the end of the 12-month period beginning on the date of publication of the notice in the Federal Register;
“(II) the act of infringement commenced before the end of the 12-month period described in subclause (I) and continued after the end of that 12-month period, in which case remedies shall be available only for infringement occurring after the end of that 12-month period; or
*338 “(HI) copies or phonorecords of a work in which copyright has been restored under this section are made after publication of the notice of intent in the Federal Register.
“(B)(i) The owner of the restored copyright (or such owner’s agent) or the owner of an exclusive right therein (or such owner’s agent) serves upon a reliance party a notice of intent to enforce a restored copyright; and
“(ii)(I) the act of infringement commenced after the end of the 12-month period beginning on the date the notice of intent is received;
“(II) the act of infringement commenced before the end of the 12-month period described in subclause (I) and continued after the end of that 12-month period, in which case remedies shall be available only for the infringement occurring after the end of that 12-month period; or
“(III) copies or phonorecords of a work in which copyright has been restored under this section are made after receipt of the notice of intent.
“In the event that notice is provided under both subpara-graphs (A) and (B), the 12-month period referred to in such subparagraphs shall run from the earlier of publication or service of notice.
“(3) Existing derivative works. — (A) In the case of a derivative work that is based upon a restored work and is created—
“(i) before the date of the enactment of the Uruguay Round Agreements Act, if the source country of the restored work is an eligible country on such date, or
“(ii) before the date on which the source country of the restored work becomes an eligible country, if that country is not an eligible country on such date of enactment,
“a reliance party may continue to exploit that derivative work for the duration of the restored copyright if the reliance party pays to the owner of the restored copyright reasonable compensation for conduct which would be subject to a remedy for infringement but for the provisions of this paragraph.
*339 “(B) In the absence of an agreement between the parties, the amount of such compensation shall be determined by an action in United States district court, and shall reflect any harm to the actual or potential market for or value of the restored work from the reliance party’s continued exploitation of the work, as well as compensation for the relative contributions of expression of the author of the restored work and the reliance party to the derivative work.
“(4) Commencement of infringement for reliance parties. — For purposes of section 412, in the case of reliance parties, infringement shall be deemed to have commenced before registration when acts which would have constituted infringement had the restored work been subject to copyright were commenced before the date of restoration.
“(e) Notices of Intent to Enforce a Restored Copyright.—
“(1) Notices of intent filed with the copyright office. — (A)(i) A notice of intent filed with the Copyright Office to enforce a restored copyright shall be signed by the owner of the restored copyright or the owner of an exclusive right therein, who files the notice under subsection (d)(2)(A)(i) (hereafter in this paragraph referred to as the ‘owner’), or by the owner’s agent, shall identify the title of the restored work, and shall include an English translation of the title and any other alternative titles known to the owner by which the restored work may be identified, and an address and telephone number at which the owner may be contacted. If the notice is signed by an agent, the agency relationship must have been constituted in a writing signed by the owner before the filing of the notice. The Copyright Office may specifically require in regulations other information to be included in the notice, but failure to provide such other information shall not invalidate the notice or be a basis for refusal to list the restored work in the Federal Register.
“(ii) If a work in which copyright is restored has no formal title, it shall be described in the notice of intent in detail sufficient to identify it.
*340 “(iii) Minor errors or omissions may be corrected by farther notice at any time after the notice of intent is filed. Notices of corrections for such minor errors or omissions shall be accepted after the period established in subsection (d)(2)(A)(i). Notices shall be published in the Federal Register pursuant to subparagraph (B).
“(B)(i) The Register of Copyrights shall publish in the Federal Register, commencing not later than 4 months after the date of restoration for a particular nation and every 4 months thereafter for a period of 2 years, lists identifying restored works and the ownership thereof if a notice of intent to enforce a restored copyright has been filed.
“(fi) Not less than 1 list containing all notices of intent to enforce shall be maintained in the Public Information Office of the Copyright Office and shall be available for public inspection and copying during regular business hours pursuant to sections 705 and 708.
“(C) The Register of Copyrights is authorized to fix reasonable fees based on the costs of receipt, processing, recording, and publication of notices of intent to enforce a restored copyright and corrections thereto.
“(D)(i) Not later than 90 days before the date the Agreement on Trade-Related Aspects of Intellectual Property referred to in section 101(d)(15) of the Uruguay Round Agreements Act enters into force with respect to the United States, the Copyright Office shall issue and publish in the Federal Register regulations governing the filing under this subsection of notices of intent to enforce a restored copyright.
“(ii) Such regulations shall permit owners of restored copyrights to file simultaneously for registration of the restored copyright.
“(2) Notices op intent served on a reliance party.— (A) Notices of intent to enforce a restored copyright may be served on a reliance party at any time after the date of restoration of the restored copyright.
*341 “(B) Notices of intent to enforce a restored copyright served on a reliance party shall be signed by the owner or the owner’s agent, shall identify the restored work and the work in which the restored work is used, if any, in detail sufficient to identify them, and shall include an English translation of the title, any other alternative titles known to the owner by which the work may be identified, the use or uses to which the owner objects, and an address and telephone number at which the reliance party may contact the owner. If the notice is signed by an agent, the agency relationship must have been constituted in writing and signed by the owner before service of the notice.
“(3) EFFECT OF MATERIAL FALSE STATEMENTS. — -Any material false statement knowingly made with respect to any restored copyright identified in any notice of intent shall make void all claims and assertions made with respect to such restored copyright.
“(f) Immunity From Warranty and Related Liability.—
“(1) In general. — Any person who warrants, promises, or guarantees that a work does not violate an exclusive right granted in section 106 shall not be liable for legal, equitable, arbitral, or administrative relief if the warranty, promise, or guarantee is breached by virtue of the restoration of copyright under this section, if such warranty, promise, or guarantee is made before January 1, 1995.
“(2) Performances. — No person shall be required to perform any act if such performance is made infringing by virtue of the restoration of copyright under the provisions of this section, if the obligation to perform was undertaken before January 1, 1995.
“(g) Proclamation of Copyright Restoration. — Whenever the President finds that a particular foreign nation extends, to works by authors who are nationals or domiciliaries of the United States, restored copyright protection on substantially the same basis as provided under this section, the *342 President may by proclamation extend restored protection provided under this section to any work—
“(1) of which one or more of the authors is, on the date of first publication, a national, domiciliary, or sovereign authority of that nation; or
“(2) which was first published in that nation.
“The President may revise, suspend, or revoke any such proclamation or impose any conditions or limitations on protection under such a proclamation.
“(h) DEFINITIONS. — For purposes of this section and section 109(a):
“(1) The term ‘date of adherence or proclamation' means the earlier of the date on which a foreign nation which, as of the date the WTO Agreement enters into force with respect to the United States, is not a nation adhering to the Berne Convention or a WTO member country, becomes—
“(A) a nation adhering to the Berne Convention;
“(B) a WTO member country;
“(C) a nation adhering to the WIPO Copyright Treaty;
“(D) a nation adhering to the WIPO Performances and Phonograms Treaty; or
“(E) subject to a Presidential proclamation under subsection (g).
“(2) The ‘date of restoration’ of a restored copyright is—
“(A) January 1, 1996, if the source country of the restored work is a nation adhering to the Berne Convention or a WTO member country on such date, or
“(B) the date of adherence or proclamation, in the case of any other source country of the restored work.
“(3) The term ‘eligible country’ means a nation, other than the United States, that—
“(A) becomes a WTO member country after the date of the enactment of the Uruguay Round Agreements Act;
“(B) on such date of enactment is, or after such date of enactment becomes, a nation adhering to the Berne Convention;
*343 “(C) adheres to the WIPO Copyright Treaty;
“(D) adheres to the WIPO Performances and Phono-grams Treaty; or
“(E) after such date of enactment becomes subject to a proclamation under subsection (g).
“(4) The term “reliance party” means any person who—
“(A) with respect to a particular work, engages in acts, before the source country of that work becomes an eligible country, which would have violated section 106 if the restored work had been subject to copyright protection, and who, after the source country becomes an eligible country, continues to engage in such acts;
“(B) before the source country of a particular work becomes an eligible country, makes or acquires 1 or more copies or phonorecords of that work; or
“(C) as the result of the sale or other disposition of a derivative work covered under subsection (d)(3), or significant assets of a person described in subparagraph (A) or (B), is a successor, assignee, or licensee of that person.
“(5) The term ‘restored copyright’ means copyright in a restored work under this section.
“(6) The term ‘restored work’ means an original work of authorship that—
“(A) is protected under subsection (a);
“(B) is not in the public domain in its source country through expiration of term of protection;
“(C) is in the public domain in the United States due to—
“(i) noncompliance with formalities imposed at any time by United States copyright law, including failure of renewal, lack of proper notice, or failure to comply with any manufacturing requirements;.
“(ii) lack of subject matter protection in the case of sound recordings fixed before February 15, 1972; or
“(iii) lack of national eligibility;
“(D) has at least one author or rightholder who was, at the time the work was created, a national or domiciliary of *344 an eligible country, and if published, was first published in an eligible country and not published in the United States during the 30-day period following publication in such eligible country; and
“(E) if the source country for the work is an eligible country solely by virtue of its adherence to the WIPO Performances and Phonograms Treaty, is a sound recording.
“(7) The term ‘rightholder’ means the person—
“(A) who, with respect to a sound recording, first fixes a sound recording with authorization, or
“(B) who has acquired rights from the person described in subparagraph (A) by means of any conveyance or by operation of law.
“(8) The ‘source country’ of a restored work is—
“(A) a nation other than the United States;
“(B) in the case of an unpublished work—
“(i) the eligible country in which the author or right-holder is a national or domiciliary, or, if a restored work has more than 1 author or rightholder, of which the majority of foreign authors or rightholders are nationals or domiciliar-ies; or
“(ii) if the majority of authors or rightholders are not foreign, the nation other than the United States which has the most significant contacts with the work; and
“(C) in the case of a published work—
“(i) the eligible country in which the work is first published, or
“(ii) if the restored work is published on the same day in 2 or more eligible countries, the eligible country which has the most significant contacts with the work.”

 Article 18 of the Berne Convention provides:
“(1) This Convention shall apply to all works which, at the moment of its coming into force, have not yet fallen into the public domain in the country of origin through the expiry of the term of protection.
“(2) If, however, through the expiry of the term of protection which was previously granted, a work has fallen into the public domain of the *309 country where protection is claimed, that work shall not be protected anew.
“(3) The application of this principle shall be subject to any provisions contained in special conventions to that effect existing or to be concluded between countries of the Union. In the absence of such provisions, the respective countries shall determine, each in so far as it is concerned, the conditions of application of this principle.
“(4) The preceding provisions shall also apply in the case of new accessions to the Union and to cases in which protection is extended by the application of Article 7 or by the abandonment of reservations.” 828 U. N. T. S. 251.

 As noted by the Government’s amici, the United States excluded foreign works from copyright not to swell the number of unprotected works available to the consuming public, but to favor domestic publishing interests that escaped paying royalties to foreign authors. See Brief for International Publishers Association et al. as Amici Curiae 8-15. This free riding, according to Senator Jonathan Chace, champion of the 1891 Act, made the United States “the Barbaxy coast of literature” and its people “the buccaneers of books.” S. Rep. No. 622, 50th Cong., 1st Sess., 2 (1888).

 See also S. Rep. No. 103-412, p. 225 (1994) (“While the United States declared its compliance with the Berne Convention in 1989, it never addressed or enacted legislation to implement Article 18 of the Convention.”); Memorandum from Chris Sehroeder, Counselor to the Assistant Attorney General, Office of Legal Counsel, Dept, of Justice (DOJ), to Ira S. Shapiro, General Counsel, Office of the U. S. Trade Representative (July 29, 1994), in W. Patry, Copyright and the GATT, p. C-15 (1995) (“At the time Congress was debating the BCIA, it reserved the issue of removing works from the public domain.”); General Agreement on Tariffs and Trade (GATT): Intellectual Property Provisions, Joint Hearing before the Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary and the Subcommittee on Patents, Copyrights and Trademarks of the Senate Committee on the Judiciary, 103d Cong., 2d Sess., 120 (1994) (URAA Joint Hearing) (app. to statement of Bruce A. Lehman, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks (Commerce Dept.) (‘When the United States adhered to the Berne Convention, Congress . . . acknowledged that the possibility of restoring copyright protection for foreign works that had fallen into the public domain in the United States for failure to comply with formalities was an issue that merited further discussion.”)).

 The dissent implicitly agrees that, whatever tentative conclusion Congress reached in 1988, Article 18 requires the United States to “protect the foreign works at issue,” at least absent a special convention the United States did not here negotiate. Post, at 365. See also post, at 366 (citing Gervais, Golan v. Holder: A Look at the Constraints Imposed by the Berne Convention, 64 Vand. L. Rev. En Bane 147, 151-152 (2011)); id., at 152 (“[T]he Convention clearly requires that some level of protection be given to foreign authors whose works have entered the public domain (other than by expiration of previous copyright).”). Accord S. Ricketson, The Berne Convention for the Protection of Literary and Artistic Works 1886-1986, p. 675 (1987) (“There is no basis on which [protection of existing works under Article 18] can be completely denied. The conditions and reservations,” authorized by Article 18(3) (and stressed by the dissent, post, at 366-367), are of “limited” and “transitional” duration and “would not be permitted to deny [protection] altogether in relation to a particular class ... of works.”).

 NAFTA ultimately included a limited retroactivity provision — a precursor to § 514 of the URAA — granting U. S. copyright protection to certain Mexican and Canadian films. These films had fallen into the public domain, between 1978 and 1988, for failure to meet U. S. notice requirements. See North American Free Trade Agreement Implementation Act, §334, 107 Stat. 2115; Brief for Franklin Pierce Center for Intellectual Property as Amicus Curiae 14-16. One year later, Congress replaced this provision with the version of 17 U. S. C. § 104A at issue here. See 3 M. Nimmer & D. Nimmer, Copyright §9A.03, 9A.04, pp. 9A-17, 9A-22 (2011) (hereinafter Nimmer).

 This tension between the United States and its new Berne counter-parties calls into question the dissent’s assertion that, despite the 1988 Act’s minimalist approach, “[t]he United States obtained the benefits of Berne for many years.” Post, at 365. During this six-year period, Congress had reason to doubt that U. S. authors enjoyed the full benefits of Berne membership.

 Marrakesh Agreement Establishing the World Trade Organization, Apr. 15, 1994, 1867 U. N. T. S. 154.

 Proponents of prompt congressional action urged that avoiding a trade enforcement proceeding — potentially the WTO’s first — would be instrumental in preserving the United States’ “reputation as a world leader in the copyright field.” URAA Joint Hearing 241 (statement of Eric Smith, International Intellectual Property Alliance (IIPA)). In this regard, U. S. negotiators reported that widespread perception of U. S. noncomplianee was undermining our leverage in copyright negotiations. Unimpeachable adherence to Berne, Congress was told, would help ensure enhanced foreign protection, and hence profitable dissemination, for existing and future U. S. works. See id., at 120 (app. to statement of Lehman, Commerce Dept.) (“Clearly, providing for [retroactive] protection for existing works in our own law will improve our position in future negotiations.”); id., at 268 (statement of Berman, RIAA).

 Title 17 U. S. C. §104A is reproduced in full in an appendix to this opinion.

 Works from most, but not all, foreign countries are eligible for protection under § 514. The provision covers only works that have “at least one author or rightholder who was, at the time the work was created, a national or domiciliary of an eligible country.” 17 U. S. C. § 104A(h)(6)(D). An “eligible country” includes any “nation, other than the United States, that — (A) becomes a WTO member country after the date of the enactment of the [URAA]; [or] (B) on such date of enactment is, or after such date of enactment becomes, a nation adhering to the Berne Convention.” § 104A(h)(3). As noted above, see supra, at 308, 164 countries adhere to the Berne Convention. World Intellectual Property Organization, Contracting Parties: Berne Convention, www.wipo.int/treaties (as visited Jan. 13, 2012, and in Clerk of Court’s case file).

 From the first Copyright Act until late in the 20th century, Congress conditioned copyright protection on compliance with certain statutory formalities. The most notable required an author to register her work, renew that registration, and affix to published copies notice of copyrighted status. The formalities drew criticism as a trap for the unwary. See, e. g., 2 Nimmer § 7.01[A], at 7-8; Doyle, Cary, McCannon, & Ringer, Notice of Copyright, Study No. 7, p. 46 (1957), reprinted in 1 Studies on Copyright 229, 272 (1963).
In 1976, Congress eliminated the registration renewal requirement for future works. Copyright Act of 1976, §§302, 408, 90 Stat. 2572, 2580. In 1988, it repealed the mandatory notice prerequisite. BCIA § 7, 102 Stat. 2857. And in 1992, Congress made renewal automatic for works still in their first term of protection. Copyright Amendments Act of 1992, 106 Stat. 264-266. The Copyright Act retains, however, incentives for authors to register their works and provide notice of the works’ copyrighted status. See, e. g., 17 U. S. C. § 405(b) (precluding actual and statutory damages against “innocent infringers” of a work that lacked notice of copyrighted status); § 411(a) (requiring registration of U. S. “work[s],” but not foreign works, before an owner may sue for infringement). The revisions *315 successively made accord with Berne Convention Article 5(2), which proscribes application of copyright formalities to foreign authors. Berne, however, affords domestic authors no escape from domestic formalities. See Art. 5(3) (protection within country of origin is a matter of domestic law).

 Title 17 U. S. C. § 104A(h)(6)(B) defines a “restored work” to exclude “an original work of authorship” that is “in the public domain in its source country through expiration of [its] term of protection.” This provision tracks Berne’s denial of protection for any work that has “fallen into the public domain in the country of origin through the expiry of the term of protection.” Art. 18(1), 828 U. N. T. S., at 251.

 Restoration is a misnomer insofar as it implies that all works protected under §104A previously enjoyed protection. Each work in the public domain because of lack of national eligibility or subject-matter protection, and many that failed to comply with formalities, never enjoyed U. S. copyright protection. See, e. g., 3 Nimmer § 9A.04[A][l][b][iii], at 9A-26, and n. 29.4.

 A reliance party must have used the work in a manner that would constitute infringement had a valid copyright been in effect. See § 104A(h)(4)(A). After restoration, the reliance party is limited to her previous uses. A performer of a restored work, for example, cannot, post-restoration, venture to sell copies of the script. See 3 Nimmer §9A.04[C][l][a], at 9A-45 to 9A-46.

 Petitioners’ complaint also challenged the constitutionality of the Copyright Term Extension Act, 112 Stat. 2827, which added 20 years to the duration ofpxisting and future copyrights. After this Court rejected a similar challenge in Eldred v. Ashcroft, 537 U. S. 186 (2003), the District Court dismissed this portion of petitioners’ suit on the pleadings, Golan v. Ashcroft, 310 F. Supp. 2d 1215 (D Colo. 2004). The Tenth Circuit affirmed, Golan v. Gonzales, 501 F. 3d 1179 (2007), and petitioners do not *317 attempt to revive that claim in this Court, Pet. for Cert. 7, n. 2. Neither have petitioners challenged the District Court’s entry of summary judgment for the Government on the claim that § 514 violates the substantive component of the Due Process Clause.

 Cf. 3 Nimmer § 9A.02[A][2], at 9A-11, n. 28 (“[I]t stretches the language of the Berne Convention past the breaking point to posit that following ‘expiry of the zero term’ the . . . work need not be resurrected.”).

 See B. Bugbee, Genesis of American Patent and Copyright Law 123-124 (1967) (hereinafter Bugbee) (Delaware, Maryland, and Pennsylvania).

 See 1783 Mass. Acts p. 236; 1783 N. J. Laws p. 47; 1783 N. H. Laws p. 521; 1783 R. I. Laws pp. 6-7; 1784 S. C. Acts p. 49; 1785 Va. Acts eh. VI; 1786 N. Y. Laws p. 298.

 1783 Conn. Pub. Acts p. 617; 1783 N. J. Laws p. 47; 1785 N. C. Laws p. 563; 1786 Ga. Laws p. 323. In four States, copyright enforcement was restricted to works “not yet printed” or “hereinafter published.” 1783 Mass. Acts p. 236; 1783 N. H. Laws p. 521; 1783 R. I. Laws pp. 6-7; 1784 S. C. Acts p. 49.

 See Bugbee 109-123.

 The parties debate the extent to which the First Congress removed works from the public domain. We have held, however, that at least some works protected by the 1790 Act previously lacked protection. In Wheaton v. Peters, 8 Pet. 591 (1834), the Court ruled that before enactment of the 1790 Act, common-law copyright protection expired upon first publication. Id., at 657, 663. Thus published works covered by the 1790 Act previously would have been in the public domain unless protected by state statute. Had the founding generation perceived the constitutional boundary petitioners advance today, the First Congress could have designed a prospective scheme that left the public domain undisturbed. Accord Luck’s Music Library, Inc. v. Gonzales, 407 F. 3d 1262,1265 (CADC 2005) (Section 514 does not offend the Copyright Clause because, inter alia, “evidence from the First Congress,” as confirmed by Wheaton, “points toward constitutionality.”).

 Here, as in Eldred, “[bjecause the Clause empowering Congress to confer copyrights also authorizes patents, congressional practice with respect to patents informs our inquiry.” 537 U. S., at 201.

 Section 514 is in line with these measures; like them, it accords protection to works that had lapsed into the public domain because of failure to comply with U. S. statutory formalities. See supra, at 314, and n. 11.

 Legislation of this order, petitioners argue, is best understood as an exercise of Congress’ power to remedy excusable neglect. Even so, the remedy sheltered creations that, absent congressional action, would have been open to free exploitation. Such action, according to petitioners’ dominant argument, see supra, at 318-320, is ever and always impermissible. Accord Luck’s Music Library, 407 F. 3d, at 1265-1266 (“Plaintiffs urge that [the 1790 Act and the wartime legislation] simply extended the time limits for filing and [did] not purport to modify the prohibition on removing works from the public domain. But to the extent that potential copyright holders failed to satisfy procedural requirements, such works”— like those protected by §514 — “would necessarily have already entered the public domain ....”).

 But see Brief for Motion Picture Association of America as Amicus Curiae 27 (observing that income from existing works can finance the creation and publication of new works); Eldred, 537 U. S., at 208, n. 15 (noting that Noah Webster “supported his entire family from the earnings on his speller and grammar during the twenty years he took to complete his dictionary” (internal quotation marks omitted)).

 The dissent also suggests, more tentatively, that at least where copyright legislation extends protection to works previously in the public domain, Congress must counterbalance that restriction with new incentives to create. Post, at 351. Even assuming the public domain were a category of constitutional significance, contra supra, at 318-324, we would not understand “the Progress of Science” to have this contingent meaning.

 That the same economic incentives might also induce the dissemination of futons, fruit, or Bibles, see post, at 363, is no answer to this evidence that legislation furthering the dissemination of literary property has long been thought a legitimate way to “promote the Progress of Science.”

 The dissent suggests that the “utilitarian view of copyrigh[t]” embraced by Jefferson, Madison, and our case law sets us apart from continental Europe and inhibits us from harmonizing our copyright laws with those of countries in the civil-law tradition. See post, at 348-349, 365. For persuasive refutation of that suggestion, see Austin, Does the Copyright Clause Mandate Isolationism? 26 Colum. J. L. & Arts 17, 59 (2002) (cautioning against “an isolationist reading of the Copyright Clause that is in tension with ... America’s international copyright relations over the last hundred or so years”).

 On the initial appeal in this case, the Tenth Circuit gave an unconfined reading to our reference in Eldred to “traditional contours of copyright.” 501 F. 3d, at 1187-1196. That reading was incorrect, as we here clarify.

 See Eldred, 537 U. S., at 221 (“Protection of [an author’s original expression from unrestricted exploitation] does not raise the free speech concerns present when the government compels or burdens the communication of particular facts or ideas.”).

 Focusing narrowly on the specific problem of orphan works, the dissent overlooks these principal protections against “the dissemination-restricting harms of copyright.” Post, at 357.

 “[R]equir[ing] works that have already fallen into the public domain to stay there” might, as the dissent asserts, supply an “easily administrable standard.” Post, at 358. However attractive this bright-line rule might *331 be, it is not a rule rooted in the constitutional text or history. Nor can it fairly be gleaned from our case law. The dissent cites three decisions to document its assertion that “this Court has assumed the particular importance of public domain material in roughly analogous circumstances.” Ibid. The dictum in Graham, v. John Deere Co. of Kansas City, 383 U. S. 1,6 (1966), noted earlier, did not treat the public domain as a constitutional limit — certainly not under the rubric of the First Amendment. See swpra, at 323-324. The other two decisions the dissent cites considered whether the federal Patent Act preempted a state trade-secret law, Kew-anee Oil Co. v. Bicron Corp., 416 U. S. 470, 479-484 (1974), and whether the freedom of the press shielded reporters from liability for publishing material drawn from public court documents, Cox Broadcasting Corp. v. Cohn, 420 U. S. 469, 495-497 (1975). Neither decision remotely ascribed constitutional significance to a work’s public domain status.

 It was the Fifth Amendment’s Takings Clause — not the First Amendment — that Congress apparently perceived to be a potential check on its authority to protect works then freely available to the public. See URAA Joint Hearing 3 (statement of Rep. Hughes); id., at 121 (app. to statement of Lehman, Commerce Dept.); id., at 141 (statement of Shapiro, USTR); id., at 145 (statement of Christopher Schroeder, DOJ). The reliance-party protections supplied by §514, see supra, at 316, were meant to address such concerns. See URAA Joint Hearing 148-149 (prepared statement of Schroeder).

 Because Shostakovich was a pre-1973 Russian composer, his works were not protected in the United States. See U. S. Copyright Office, Circular No. 38A: The International Copyright Relations of the United States 9, 11, n. 2 (2010) (copyright relations between the Soviet Union and the United States date to 1973).

 Persistently deploring “ ‘restored copyright’ protection [because it] removes material from the public domain,” post, at 357, the dissent does not pause to consider when and why the material came to be lodged in that domain. Most of the works affected by § 514 got there after a term of zero or a term cut short by failure to observe U. S. formalities. See supra, at 314.

 The pervasive problem of copyright piracy, noted post, at 356-357, likewise is scarcely limited to protected foreign works formerly in the public domain.